2004 UT 101

**OAKWOOD VILLAGE LLC, a Delaware limited liability company, Plaintiff and Appellant,**

v.

**ALBERTSONS, INC., a Delaware corporation, and One Hamilton Associates Limited Partnership, a Massachusetts limited partnership, Defendants and Appellees.**

**No. 20030339.**

Supreme Court of Utah.

Dec. 3, 2004.

---

Brent V. Manning, LeGrand R. Curtis, Jr., Robin L. Wolkoff, Daniel S. Hefter, Salt Lake, for plaintiffs.

Deno G. Himonas, Bruce Wycoff, Salt Lake, for defendants.

DURHAM, Chief Justice:

## BACKGROUND

¶ 1 Plaintiff Oakwood Village, LLC (Oakwood), a commercial real estate developer, appeals the trial court's dismissal of its suit for "failure to state a claim upon which relief can be granted." Utah R. Civ. P. 12(b)(6). Oakwood claims that the trial court erred when it held that a covenant of continuous operation does not inhere in every ground lease as a matter of law. Additionally, Oakwood appeals the court's order that it pay defendants' reasonable attorney fees pursuant to paragraph 20 of the lease between Oakwood and Albertsons, Inc. (Albertsons), in which the parties agreed that the losing party in any suit relating to the lease would pay all of the prevailing party's reasonable attorney fees.

¶ 2 The three issues in this appeal are whether the trial court erred in (1) holding that a covenant of continuous operation does not inhere in every ground lease as a matter of law; (2) dismissing this case without addressing Oakwood's claim for breach of an implied covenant of good faith and fair dealing, notwithstanding this court's decision in *St. Benedict's Development Co. v. St. Benedict's Hospital,* 811 P.2d 194, 201 (Utah 1991); and (3) dismissing Oakwood's suit based on a factual determination made from material attached to the pleadings that contradicted the averments in the complaint. After considering all materials in the pleadings, we find that the lease between Oakwood and Albertsons contains no implied covenant of continuous operation and that Albertsons's conduct, while perhaps not nice, did not violate the implied covenant of good faith and fair dealing inherent in the lease. We also find that the trial court properly disposed of this case under a motion to dismiss, as opposed to converting the motion to dismiss into a motion for summary judgment, as defendants argue the trial court should have done.

## FACTS

¶ 3 On May 23, 1978, defendant Albertsons, a retail supermarket, entered into a ground lease with plaintiff Oakwood Village LLC's predecessor-in-interest, Oakwood Development Company (collectively referred to as Oakwood). On April 1, 1979, Albertsons assigned its leasehold interest in Oakwood Village Shopping Center (Oakwood Village) to One Hamilton Associates Limited Partnership (One Hamilton), also a defendant in this suit. However, under the original lease between Oakwood and Albertsons, Albertsons remains liable for One Hamilton's "full performance of Tenant's obligations."

¶ 4 Pursuant to the original contract, Albertsons leased a 42,800–square–foot plot in the 123,900–square–foot Oakwood Village Shopping Center that Oakwood was then developing in Murray, Utah. Oakwood Village consists of twenty-six stores located on the center's property, and Albertsons was to function as the center's anchor tenant. The initial term of the ground lease was twenty-five years, with the option of eight five-year renewal terms, for a total of sixty-five years if Albertsons so desired. Under the lease

and three subsequent amendments to it, Albertsons was to pay a monthly rental fee of $1667 ($20,000 per year) with no escalations in price, and all taxes, assessments, and utility charges on the leased premises for the duration of the lease. Among other terms, the lease contained an exclusive business provision precluding Oakwood from leasing space in the center to other supermarket tenants. The parties recorded the terms of their agreement in three documents: a ground lease (the lease), a development agreement (the agreement), and a declaration of restrictions and rights of easement (the declaration).

¶ 5 After completing lease negotiations with Oakwood, Albertsons constructed and paid for a building on the leased premises. Upon completion of the building in January 1980, Albertsons occupied the space where it had operated a grocery store for more than twenty-one years. In May 2001, after perceiving a better opportunity in a new shopping center across the street, Albertsons ceased operating on the leased premises and moved one block south to become the anchor tenant in the Marketplace on Ninth shopping center (Marketplace on Ninth).

¶ 6 After it relocated, Albertsons "went dark" at its location in Oakwood Village while continuing to pay the monthly rent on the now vacant building. Oakwood alleged, and defendants' counsel admitted at trial, that Albertsons's intentionally kept the old building unoccupied in order to restrict competition with its new store. Oakwood attributes Albertsons departure from Oakwood Village as the cause of the decline in sales of its remaining stores and the current vacancy of four stores, the occupants of three of which followed Albertsons to the new center.

¶ 7 On April 18, 2002, Oakwood advised Albertsons that it had breached its obligation under the lease to operate continuously and to act in good faith and deal fairly, and demanded that Albertsons remedy its breach within thirty days pursuant to the lease. Albertsons responded on May 3, 2002, refusing to acknowledge breach of the lease or to take any curative action. Thereafter, Oakwood filed suit against Albertsons for breach of the aforementioned covenants. For Albertsons alleged contractual breaches, Oakwood sought declaratory relief allowing it to terminate the lease and to re-enter and re-let the premises, and damages in excess of $1,000,000.

## STANDARD OF REVIEW

¶ 8 " 'A Rule 12(b)(6) motion to dismiss admits the facts alleged in the complaint but challenges the plaintiff's right to relief based on those facts.' " *Russell v. Standard Corp.*, 898 P.2d 263, 264 (Utah 1995) (quoting *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 196 (Utah 1991)). Under a rule 12(b)(6) dismissal, our inquiry is concerned solely with "the sufficiency of the pleadings, [and] not the underlying merits of [the] case." *Alvarez v. Galetka*, 933 P.2d 987, 989 (Utah 1997).

¶ 9 In reviewing the trial court's decision, we accept the factual allegations in the complaint as true and interpret those facts and all inferences drawn from them in the light most favorable to the plaintiff as the non-moving party. *Krouse v. Bower*, 2001 UT 28, ¶ 2, 20 P.3d 895. A trial court's decision granting a rule 12(b)(6) motion to dismiss a complaint for lack of a remedy is a question of law that we review for correctness, giving no deference to the trial court's ruling. *St. Benedict's*, 811 P.2d at 196.

## ANALYSIS

### I. PROCEDURAL ISSUES

¶ 10 We begin by addressing the procedural issues raised by the parties. Oakwood argues that the trial court failed to accept the well-pled allegations of the complaint as true and to construe those allegations in the light most favorable to Oakwood as the nonmoving party. Oakwood contends that the trial court failed in this respect by looking beyond Oakwood's averments to consider materials attached to and incorporated

into the complaint pursuant to rule 10(c) in order to reach its decision. *See* Utah R. Civ. P. 10(c). Oakwood's interpretation of the Utah Rules of Civil Procedure would allow this court to consider only the averments in the complaint and would exclude from judicial consideration anything in the documents attached to the pleadings not in harmony with those averments. However, Oakwood's exceedingly narrow reading of the Rules of Civil Procedure is incorrect. The rules are clear that documents attached to a complaint are incorporated into the pleadings for purposes of judicial notice and are fair game for this court to consider in addition to the complaint's averments. *Id.; see also* 11 James Wm. Moore et al., *Moore's Federal Practice* § 10.04[1] (3d ed.2004) [hereinafter Moore's et al.].

¶ 11 In their response, defendants present a similarly tenuous procedural argument. They contend that Oakwood's submission of three documents—the declaration, a marketing brochure for Albertsons at the Marketplace on Ninth, and a memorandum of a shopping center lease between Albertsons and a different landlord—after defendants filed a motion to dismiss converted the motion to dismiss into a motion for summary judgment. While this argument at least demonstrates familiarity with the Rules of Civil Procedure, we do not find it convincing.

■ ¶ 12 Rule 12(b) mandates that a motion to dismiss shall be converted into one for summary judgment if "matters outside the pleadings are presented to and not excluded by the court" and all parties receive "reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Utah R. Civ. P. 12(b).[1] " 'Matters outside the pleading' include any written or oral evidence … which … substantiat[es] … and does not merely reiterate what is said in the pleadings." *Moore's et al., supra,* § 56.30[4]. If a court does not exclude mate-

rial outside the pleadings and fails to convert a rule 12(b)(6) motion to one for summary judgment, it is reversible error unless the dismissal can be justified without considering the outside documents. *See GFF Corp. v. Associated Wholesale Grocers, Inc.,* 130 F.3d 1381, 1384 (10th Cir.1997).

■ ¶ 13 Notwithstanding these general principles, the majority of federal circuits recognize two exceptions. First, if "a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss." *Id.* The classic example is a contract where the complaint alleges a breach of contract. *Tierney v. Vahle,* 304 F.3d 734, 738 (7th Cir.2002). The rationale for this exception is that "[a] document that is referred to in the complaint, even though not formally incorporated by reference or attached to the complaint, is not considered to be a 'matter outside the pleading.' " *Moore's et al., supra,* § 56.30[4]. This exception exists because "[i]f the rule were otherwise, a plaintiff with a deficient claim could survive a motion to dismiss simply by not attaching a dispositive document upon which the plaintiff relied." *GFF Corp.,* 130 F.3d at 1385. Second, most federal circuits permit review of " 'mere argument contained in a memorandum in opposition to dismiss' without converting the 12(b)(6) motion into a motion for summary judgment," on the ground that such argument reiterates but does not substantiate claims in the pleadings. *County of Santa Fe v. Pub. Serv. Co.,* 311 F.3d 1031, 1036 (10th Cir.2002) (quoting *Miller v. Glanz,* 948 F.2d 1562, 1565 (10th Cir.1991)).

■ ¶ 14 In addition, the submission of documents outside the pleadings by itself is not a basis for conversion to summary judg-

---

1. Utah Rule of Civil Procedure 12(b) is identical to Federal Rule of Civil Procedure 12(b) in its description of when and how a motion to dismiss shall be converted to a motion for summary judgment. When, as here, there is almost no case law interpreting the Utah rule and the Utah and federal rules are identical, we "freely resort to federal law as a useful guide." *Plumb v. State,* 809 P.2d 734, 741 n. 9 (Utah 1990).

ment; to effect a rule 12(b) conversion, the court must have relied on those documents for its decision. *Lybrook v. Members of Farmington Mun. Sch. Bd. of Educ.,* 232 F.3d 1334, 1342 (10th Cir.2000). Thus, the Tenth Circuit Court of Appeals would find that a trial court implicitly excluded materials submitted after the motion to dismiss was filed that met neither exception unless it could be established that the trial court relied on those materials to reach its decision. *See id.*

 ¶ 15 In this case, the trial court did not rely on materials outside the pleadings for its judgment, as it based its decision entirely on the fact that a ground lease is at issue, a fact made evident from the pleadings. While we affirm the trial court's judgment, we include in our analysis additional evidence referred to in the pleadings. Specifically, we rely on the declaration because it meets the criteria of being central to and referenced in the complaint, as it is one of three documents creating a contractual relationship between the parties and it is incorporated into the complaint through its citation in the lease and agreement. We therefore rely on the declaration for our decision without necessitating a conversion to summary judgment; however, we note that our decision would be the same if we excluded the declaration. Conversely, we do not rely on the marketing brochure celebrating the arrival of Albertsons at the Marketplace on Ninth or the lease between Albertsons and a different landlord for another store, so we do not need to decide whether they qualify within the recognized exceptions. Thus, because the trial court similarly did not rely on documents considered "outside the pleadings" for purposes of rule 12(b) conversion, we find the trial court's treatment of this case under rule 12(b)(6) appropriate.

## II. SUBSTANTIVE ISSUES

¶ 16 Oakwood raises two main substantive arguments. First, it argues that an implied

covenant of continuous operation requires Albertsons to remain open throughout the entire term of the lease. Because the lease contains no continuous operation provision expressly giving Albertsons the right to go dark, Oakwood contends that Albertsons is prohibited from ceasing its grocery store operation at any time during the lease term. Second, Oakwood argues that even assuming that Albertsons has the discretion to cease operation the covenant of good faith and fair dealing inherent in the lease prohibits Albertsons from paying rent on a vacant building to restrict competition with its new store. Oakwood argues that such an act demonstrates bad faith under the circumstances and violates an implied covenant.

### A. Implied Covenant of Continuous Operation

#### 1. Contractual Terms

 ¶ 17 We first address the issue of whether a covenant of continuous operation is implied in the parties' lease.[2] The language of the relevant contracts between Oakwood and Albertsons establishing the lease appears to be complete and unambiguous, so we apply the "four corners" rule of contract analysis, looking no further than the language of the lease. E. Allan Farnsworth, *Farnsworth on Contracts* § 7.12 (2d ed. 2001). In the absence of an express covenant of continuous operation, the question becomes whether this court may infer such a covenant from the language of the lease or the conduct of the parties. *See St. Benedict's,* 811 P.2d at 198. Where the law is reluctant to recognize express restrictive covenants, such as a covenant of continuous operation, it is even more reluctant to infer them. *See id.* Recognizing that "[a] continuous operations clause in a lengthy lease has the potential to bind the lessee to operate a business in the leased premises even if it is disastrously unprofitable," *Forrest Drive As-*

2. In its complaint filed in the district court, Oakwood alleged that Albertsons breached an express as well as an implied covenant of continuous operation. Oakwood subsequently dropped

the express claim from the reply brief filed in the district court and from all briefs submitted on appeal.

*socs. v. Wal–Mart Stores, Inc.,* 72 F.Supp.2d 576, 584 n. 3 (M.D.N.C.1999), courts have been willing to infer restrictive covenants only under certain "extreme circumstances," *St. Benedict's,* 811 P.2d at 198, when supported by "substantial evidence," 5 *Thompson on Real Property* § 44.14[f][2] (David A. Thomas ed., 1994) [hereinafter Thompson]. Two such circumstances in which we have suggested that we may infer a covenant of continuous operation are (1) where there is "plain and unmistakable language in the relevant contracts which would support the restrictive covenant"; and (2) where there is a "legal necessity" to imply a restrictive covenant "to effectuate the intent of the parties." *St. Benedict's,* 811 P.2d at 198. Oakwood argues that both circumstances exist here, although it focuses primarily on the first. We address each in turn.

¶ 18 Oakwood argues that five "plain and unmistakable" provisions in the relevant contracts demonstrate the parties' intention that "the anchor tenant space in the Center [be] occupied continuously by a supermarket or some other suitable magnet retailer for the purpose of drawing shoppers to the Center." These five provisions are (1) a non-compete, or exclusive business, provision precluding Oakwood from leasing space in Oakwood Village to other supermarkets; (2) the sixty-five-year potential duration of the lease; (3) the nominal rent; (4) the language of the development agreement stating that Albertsons will participate with Oakwood in the development of the center "as an integrated retail sales complex for the mutual benefit of all real property in the Shopping Center"; and (5) the references in the lease to Albertsons "supermarket and other similar retail uses" and "proposed retail facilities."

¶ 19 Defendants counter that six equally "plain and unmistakable provisions" prevent any reasonable implication of a covenant of continuous operation (1) the absence of a percentage-rent clause, which numerous courts have found central to implying a covenant of continuous operation; (2) the absence of a use clause specifying the kind of retail business for which Albertsons's may occupy the premises; (3) Albertsons's unrestricted

right to sublet or assign its lease to another tenant; (4) Albertsons entitlement to all fixtures on the leased premises and its right to remove those fixtures at any time; (5) Oakwood's failure to make abandonment an event of "default" or to include a "going dark" provision as is common in virtually every shopping center lease; and (6) language providing that Albertsons need not rebuild a damaged or destroyed building.

¶ 20 We agree with defendants that the relevant contracts do not contain plain and unmistakable language from which this court will find an implied covenant of continuous operation. In fact, we believe on the contrary that the plain and unmistakable language of those contracts prevents us from inferring such a covenant. Because we find defendants' references to those documents convincing to their argument, we discuss each of the provisions they cite.

¶ 21 First, the fact that a percentage-rent provision is absent from the lease at issue substantially undermines Oakwood's proposition that the lease contains an implied covenant of continuous operation. The reason is that a "tenant's agreement to pay percentage rent coupled with an inadequate or insubstantial minimum or base rent" has been "[b]y far, the most popular rationale among the courts that have found implied continuous operation covenants in leases." Kathleen A. Furlong & Phyllis A. Volk, Continuous Operation Clauses, *in* 1 *The Commercial Property Lease* 71, 73 (Patrick A. Randolph, Jr. ed., 1993). A percentage-rent clause is "one that fixes the rent in whole or in part on the receipts from the tenant's use of the premises." Milton R. Friedman, 1 *Friedman on Leases* § 6:1, at 6–2 (Patrick A. Randolph, Jr. ed., 2004) [hereinafter Friedman]. It is commonly written into lease agreements to protect the landlord against inflation and the tenant against deflation where the lease is long-term. *Id.* Because payments under a percentage-rent arrangement are possible only when the tenant occupies the premises, most courts have inferred a covenant of continuous operation in a lease containing a percentage-rent clause where either the entire

rental payment was predicated on a fixed percentage of the tenant's gross receipts or the base rent payable by the tenant was inadequate to fairly compensate the landlord. Furlong & Volk, *supra*, at 73. A number of cases illustrate the importance that courts have placed on a percentage-rent provision to a finding of an implied covenant of continuous operation in a lease. *See, e.g., First Am. Bank & Trust Co. v. Safeway Stores,* 151 Ariz. 584, 729 P.2d 938 (Ct.App.1986) (inferring a covenant of continuous operation from an inadequate base rent in a percentage-rent provision); *E. Broadway Corp. v. Taco Bell Corp.,* 542 N.W.2d 816 (Iowa 1996) (finding an implied covenant of continuous operation from a substantial percentage-rent amount). Because a percentage-rent clause is "virtually universal" in shopping centers leases, Friedman, *supra*, § 6.1, at 6–3, the conspicuous absence of the provision from the lease at issue strongly suggests that the parties never intended the lease to bind Albertsons to operating a grocery store continuously at Oakwood Village.

¶ 22 Second, the absence of any, let alone a restrictive, "use of premises" clause in the lease militates against Oakwood's argument that Albertsons has a duty to generate consumer traffic for the center by operating a grocery store on a more or less permanent basis. A "use of premises" clause indicating the allowable commercial purposes for which a tenant may occupy the leased premises is a customary provision of commercial lease agreements. *See generally* Thompson, *supra*, § 97.06(c)(18), at 99–100. The lack of such a clause here indicates that Oakwood was not concerned with the type of business Albertsons conducted. Specifically, notwithstanding the lack of a restrictive use clause concerning Albertsons's property, the lease's general and expressly nonexclusive description of the business uses for which any property leased at Oakwood Village may be employed by the tenant suggests that Albertsons may use its property for purposes other than operating a grocery store. The lease states that a tenant may use any property leased in the center "to *permit* the con-struction and operation of retail facilities and parking on the Leased Premises, *including* supermarkets, drug and variety stores, or combinations thereof, and other similar retail uses, without conditions thereto which in Tenant's reasonable opinion would cause construction and operation to be uneconomical" (emphasis added). Thus, the language of the lease contemplates very broad use of the premises by Albertsons with no specific business restrictions and no apparent requirement of ongoing operation. This contradicts Oakwood's argument that the lease contains an implied covenant under which Oakwood assumed responsibility for drawing consumer traffic to the center as a continuous tenant.

¶ 23 Third, Albertsons's right to sublet or assign the lease, without the landlord's consent and with no restriction on the type of sublettees or assignees, strongly undermines Oakwood's argument that Albertsons has promised to operate on the premises for the entire duration of the lease term. While this court has not addressed the question, among those courts that have, nearly every one has found an unrestricted right to sublet or assign a lease to be inconsistent with the implication of a covenant of continuous operation. *See Okla. Plaza Investors v. Wal–Mart Stores, Inc.,* 155 F.3d 1179, 1181 (10th Cir. 1998) (finding no implied covenant of continuous operation "in the face of an express right to assign or sublet" without the landlord's consent); *Cascade Drive Ltd. P'ship v. Wal–Mart Stores, Inc.,* 934 F.2d 61, 62 (5th Cir. 1991) (refusing to infer a continuous operation covenant in a lease containing a clause restricting the tenant to conducting "any lawful retail purpose except for a theater or prescription pharmacy" and granting the tenant a right to sublet only with the landlord's consent); *Forrest Drive Assocs.,* 72 F.Supp.2d at 585 (finding an unrestricted "assignment or subletting" clause to be inconsistent with a covenant of continuous operation and noting that the "lease clearly put plaintiff on notice that defendant Wal–Mart could leave and sublet at any time"); *Plaza Assocs. v. Unified Dev., Inc.,* 524 N.W.2d

725, 730 (Minn.Ct.App.1994) (explaining that the "express right of a tenant to assign or sublet and vacate the premises is inconsistent with an implied obligation to remain and do business").

¶ 24 As further support, we note that one well-respected treatise, summarizing the widespread conclusion by courts on this subject, has declared that an "[e]xpress right to assign or sublet and vacate the premises is not consistent with an implied obligation to remain and do business." Friedman, *supra*, § 6:9.3, at 6–49. Similarly, another has stated that "anything less than a total prohibition against assignment or subletting by the tenant argues against the proposition that the tenant has promised to continue to operate in the premises for the entire duration of the lease term." Bernard M. Levy, The Store Went Dark–The Landlord's Side," 2 *The Commercial Property Lease* 159, 166 (Patrick A. Randolph, Jr. ed., 1997). Oakwood's request is further weakened by the fact that the lease does not have a provision to protect Oakwood against the scenario where Albertsons sublet to another tenant which then decided to go dark.

¶ 25 Fourth, a provision permitting Albertsons to own and install "in the Leased Premises such fixtures and equipment as Tenant deems desirable" and to remove "Tenant's personal property from the Leased Premises at any time," a provision commonly seen in combination with a right to sublet or assign the lease, is not consistent with a duty of continuous operation. *See United Assocs. v. Wal–Mart Stores,* 133 F.3d 1296, 1298 (10th Cir.1997) (finding no implied covenant of continuous operation where the lease plainly allowed the tenant to remove his fixtures, goods, and equipment at any time and to sublet or assign the lease without the landlord's consent).

¶ 26 Fifth, the lack of any provision allowing Oakwood to reenter and relet the premises in the event that the tenant vacates weighs against a finding of an implied covenant of continuous operation. Many shopping center leases contain a provision providing that if the tenant ceases to operate in the leased premises, the landlord has the option of retaking them. The lease at issue does contain a default provision giving Oakwood the right to "decree the term ended and enter the Leased Premises" or "re-enter the Leased Premises and sublet the whole or any part thereof"; however, the default provision does not indicate that "going dark" triggers its operation. Under the lease terms, it appears only that being in default on rent would constitute a default on the lease. Oakwood argues that because the real consideration for the lease is not the nominal rent paid by Albertsons's but is instead Albertsons ability to generate consumer traffic essential for the center's vitality, Albertsons "going dark" qualifies as a default. However, because the lease contains no provision, either express or implied, indicating that Albertsons has a legal duty to operate a supermarket continuously on the premises, Albertsons cannot be considered to have breached the lease by discontinuing its grocery store operation.

¶ 27 Sixth, Albertsons points out that the lease does not impose a legal duty on Albertsons to erect any structure on the premises and that, having constructed a building, Albertsons is under no legal obligation to occupy the building at all. In support of this proposition, Albertsons cites the right to raze in the lease:

> Tenant *may,* at Tenant's expense, raze *any* improvements on the Leased Premises and construct on the Leased Premises any improvements, *including, without limitation,* a store building and parking area, and make such repairs, additions, alterations and improvements thereto as Tenant may deem desirable.

(Emphasis added.) It is true that Oakwood agrees in the declaration to construct a building pad running electrical wires and utility pipes to the property suitable for Albertsons's to construct a building. However, Albertsons argument that it has no obligation to build at all is strongly supported by the fact that, under the lease, Albertsons is expressly not obligated to rebuild a damaged or

destroyed building. The lease states that "[i]n the event any building on the Leased Premises is damaged or destroyed by a casualty, Tenant shall *either* repair or restore the building, *or remove the rubble and leave the ground in a sightly condition*" (emphasis added). Drafters should include provisions in their contracts compelling construction and reconstruction in the event of destruction and specifying the time frame for completing such activities. *See 2 Powell on Real Property* § 17A.01[2] (Michael Allan Wolf ed., 1997). Provisions of this kind are not only absent from this lease but are replaced by contrary provisions essentially granting Albertsons free reign. It is evident from the absence of a rebuild provision that both parties contemplated a scenario in which Albertsons would pay rent indefinitely on bare ground. Albertsons thus cannot be said to have agreed in the lease to take responsibility for drawing consumer traffic to the center as Oakwood has argued.

¶ 28 In sum, we conclude that the lease lacks the plain and unmistakable language necessary to support the inference of a covenant of continuous operation.

¶ 29 As previously noted, even in the absence of plain and unmistakable language in the relevant contracts to support the implication of a restrictive covenant, we will infer such covenant when it is legally necessary. *St. Benedict's*, 811 P.2d at 198. While "legal necessity" may sound like a broad category, courts have been willing to find a legally necessary covenant only where it arises from the "terms of a contract or the substance thereof . . . [which] clearly authorize[ ] the inference of an imputation in law of the creation of a covenant" and the "circumstances attending [the contract's] execution." 20 Am.Jur.2d *Covenants, Conditions, and Restrictions* § 29 (2004). As defendants properly note, courts will not infer a restrictive covenant into a contract to effect social policy. In other words, courts will read the covenant into contracts " 'in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the con-

tract's purpose.' " *Peterson v. Browning*, 832 P.2d 1280, 1284 (Utah 1992) (quoting *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373, 394 (1988)). It is not enough to say that the covenant ought to be read into a contract to make the contract fair, and that without the covenant, the contract would be improvident or unwise, or create an unjust outcome. *See* 20 Am.Jur.2d *Covenants, Conditions, and Restrictions* § 29. Here, where express language in the lease would contradict an implied covenant of continuous operation, we decline to recognize the covenant as legally necessary.

¶ 30 Consequently, we cannot find an implied covenant of continuous operation in the parties' lease either from the language of the relevant contracts or on the grounds that such a covenant is legally necessary to effectuate express contractual covenants or promises.

¶ 31 Not only are defendants' arguments concerning the text of the relevant contracts convincing to their position, but Oakwood's arguments on this subject are not persuasive. Oakwood notes that in the declaration the parties agreed to develop the shopping center "as an integrated retail sales complex for the mutual benefit of all real property in the Shopping Center." Oakwood points out that paragraph 9.1 of the lease provides that a breach of the declaration constitutes a breach of the lease, and, as such, because Albertsons's "going dark" was not for the "mutual benefit" of the center, Albertsons was in breach of the lease when it ceased its grocery store operation. However, without more substantial textual evidence, and in light of unambiguous contractual language permitting Albertsons to raze but not obliging Albertsons to rebuild, this phrase is best understood as a boilerplate statement of the parties' intent to cooperate and not as a promise by Albertsons to engage in or refrain from specific actions. Indeed, the parties' agreement expressly disclaims a mutually dependent relationship between Oakwood and Albertsons. The agreement states that the "provisions are not intended to create,

nor shall they be in any way interpreted to create, a joint venture, a partnership, or any other similar relationship between the parties."

¶ 32 Oakwood also cites language in the development agreement in which the parties "agree[d] that the Shopping Center [would] be developed as a uniform and harmonious "development"; however, Oakwood fails to cite this statement in full. The sentence concludes with the phrase "as generally shown on Exhibit 'A.' " Exhibit A, however, is the lease itself, and, as previously discussed, the lease contains no plain and unmistakable language from which a covenant of continuous operation can be inferred. Without further uncontroverted evidence, this phrase cannot be interpreted to impose a legal duty on Albertsons to operate a grocery store for the duration of the lease.

¶ 33 In addition, Oakwood's reliance on the four principle cases it cites—*Lagrew v. Hooks–SupeRx, Inc.*, 905 F.Supp. 401 (E.D.Ky.1995); *Fifth Avenue Shopping Center, Inc. v. Grand Union Co.*, 491 F.Supp. 77 (N.D.Ga.1980); *Ingannamorte v. Kings Super Markets, Inc.*, 55 N.J. 223, 260 A.2d 841 (1970); and *Columbia E. Assoc. v. Bi–Lo, Inc.*, 299 S.C. 515, 386 S.E.2d 259 (Ct.App. 1989)—is misplaced. Oakwood cites *Lagrew*, the decision of a federal district court in Kentucky, as standing for the proposition that "[t]he presence of a right to assign or sublet is not necessarily inconsistent with an implied covenant of continuous operation," and as indicating that the "two covenants can be harmonized to permit subletting or assignment to a business of the same character." 905 F.Supp. at 406 (internal quotation omitted). However, as defendants point out, Oakwood's reliance on *Lagrew* is misplaced for at least three reasons. First, contrary to the trial court's decision in *Lagrew*, appellate courts throughout the United States have almost universally held that "a lease provision granting the tenant the right to assign his lease or sublet the premises is inconsistent with an obligation on the part of the tenant to continuously operate his business on the premises." Robert S. Schoshinski,

*American Law of Landlord and Tenant* § 5:3, at 235 (1980); *see also* Friedman, *supra*, § 6:9.3, at 6–49. The decision in *Lagrew*, therefore, is an anomaly and fails to persuade us to follow its lead toward a conclusion that almost every other court would reject. Second, the *Lagrew* court based its decision primarily on the presence of a percentage-rent clause in the lease at issue. 905 F.Supp. at 408. However, there is no such clause in the lease between Oakwood and Albertsons. Third, *Lagrew* found that a tenant's right to retain possession of any fixtures weighs against finding an implied covenant of continuous operation. *See id.* at 407. However, Albertsons has an unrestricted right to sublet or assign its lease according to the terms of its contract with Oakwood.

¶ 34 Additionally, we are unpersuaded by Oakwood's request that we infer a covenant of continuous operation from the economically interdependent relationship between the landlord and the tenant, as the New Jersey Supreme Court did in *Ingannamorte*, 260 A.2d at 843–44, and *Tooley's Truck Stop, Inc. v. Chrisanthopouls*, 55 N.J. 231, 260 A.2d 845, 848 (1970). We are unwilling to find such a covenant on this basis because in so doing "New Jersey seems to stand alone for this proposition." *Walgreen Ariz. Drug Corp. v. Plaza Ctr. Corp.*, 132 Ariz. 512, 647 P.2d 643, 648 (Ct.App.1982). Moreover, New Jersey's unique approach to this issue is problematic because it "overlooks the well-established rule that a statement as to the use of the leased premises does not imply a covenant." *Id.* at 648.

¶ 35 We are also unconvinced that the holding in *Columbia East* is applicable to the case before us. 386 S.E.2d at 260–61. *Columbia East* presents facts similar to those presented here: A grocery store had vacated its premises while continuing to pay rent in order to restrict competition with its new store located a mere one hundred and fifty to two hundred feet away. In that case, the court held that the lease implied a covenant of continuous operation, which the grocery store breached, and noted that a "major reason *Columbia East* entered the lease was the

ability of Bi–Lo, as the anchor tenant, to draw customers to the Shopping Center as a whole." *Id.* at 262. In reaching its conclusion, the *Columbia East* court emphasized that the lease at issue contained a restrictive use clause, authorizing the premises to be "used only for the operation of a supermarket," and a restrictive sublease and assignability clause, permitting the tenant to sublet or assign the lease only in accordance with the restrictive use clause—that is, only to another supermarket. *Id.* at 260. Based on this language, the court concluded that the lease was ambiguous with respect to a covenant of continuous operation, and that it was therefore appropriate to consider parol evidence to determine whether the parties intended their lease to imply such a covenant. *Id.* at 261–62. By contrast, Albertsons's lease contains no clause mandating how Albertsons shall use its leased premises and imposes no restrictions on Albertsons's ability to sublet or assign its lease. Moreover, other provisions in Albertsons's lease clearly indicate that Oakwood did not require Albertsons to operate a grocery store continuously on the premises with responsibility for drawing consumer traffic to the center.

¶ 36 Furthermore, we are unpersuaded by Oakwood's reasoning that the question of whether to imply a covenant of continuous operation in the lease before us "cannot be decided except upon a plenary trial," as a federal district court decided in the case of *Fifth Avenue Shopping Center, Inc.,* 491 F.Supp. at 81. Albertsons's lease is distinguishable from the one in that case because it contains no percentage-rent provision, as the lease in *Fifth Avenue* did. As previously discussed, where a landlord relied on a percentage of a tenant's gross receipts for a significant portion of the rental payment, courts have usually inferred a covenant of continuous operation. Furthermore, as with the other cases Oakwood cites, *Fifth Avenue* did not involve a ground lease. *Id.* at 78.

¶ 37 We are similarly unconvinced by Oakwood's argument that the exclusive business clause in the lease, granting Albertsons the right to be the center's sole supermarket, compels a finding of an implied covenant of continuous operation. With few exceptions, courts have found that an exclusivity clause does not necessarily give rise to an implied covenant of continuous operation. *See, e.g., Plaza Assocs.,* 524 N.W.2d at 730 (explaining that an exclusive business provision in a contract is not a basis for implying a covenant of continuous operation); *Kroger Co. v. Bonny Corp.,* 134 Ga.App. 834, 216 S.E.2d 341, 343–45 (1975) (concluding that a landlord's covenant not to lease space in a shopping center to other grocery stores is not enough to imply a continuous operation covenant).

¶ 38 Finally, we are unpersuaded by Oakwood's argument that the nominal rent paid by Albertsons supports Oakwood's proposition that the real consideration was not the rental fee but was instead Albertsons's ability to generate traffic for the center. Oakwood contends that the true consideration supposes continuous operation by Albertsons. We disagree that the fact that a fixed rental is below market value alone establishes a basis for this court to infer a covenant of continuous operation. "The adequacy or inadequacy of the fixed rental only becomes a factor in determining whether a covenant should be implied when the rent is determined on a percentage basis." *Walgreen Ariz.,* 647 P.2d at 647.

2. Ground Lease

¶ 39 Finally, the fact that a ground lease rather than a lease of an already constructed commercial building is at issue is particularly detrimental to Oakwood's claim that the lease implies a covenant of continuous operation. A ground lease, as the trial court recognized, is different from an ordinary commercial lease. It is uncontested in this case that Albertsons constructed and paid for a building at Oakwood Village and that Oakwood provided only the ground and a pad on which Albertsons could build. It is further undisputed that at the end of the lease term Oakwood will regain title to the 42,300–square–foot parcel of ground and the building that Albertsons constructed at its own expense.

¶ 40 The law has clearly established that a tenant has significantly more flexibility and control over the premises under a ground lease than it has under a building lease. Indeed, "a ground lease is best considered as a financing device for developing unimproved land. The lessor's role is similar to that of a secured lender, and the lessee pays most of what is necessary to develop the land and protect the lessor's role as passive investor." *Airport Plaza, Inc. v. Blanchard,* 188 Cal. App.3d 1594, 234 Cal.Rptr. 198, 201 (1987).

> In many ways ground leasing bears a closer relationship to the fee purchase of real property than to the short-term commercial lease transaction.... Indeed, the ground lease has traditionally been used to acquire the functional equivalent of fee simple ownership of property....
>
> Unlike the short-term leasing context where [the] landlord's consent is required for such things as improvements, subleases and changes in use, the tenant under a long-term ground lease generally has the same unqualified freedom with respect to the property as a fee simple owner.
>
> It should be understood that the lessor under a long-term, net ground lease has effectively given up real estate investment in return for what essentially is a fixed-return investment, comparable to a bond.

Thompson, *supra,* § 44.13(a), at 482, 483 n. 218. The increased flexibility and control a lessee exercises over the leased premises under a ground lease than under a building lease makes it especially important for the lessor to secure certain assurances from the lessee in a ground lease. This is because "[o]nly the standards set forth in the ground lease will provide the landlord with some assurance that the construction, operation, and maintenance of the property and improvements will be sufficient to produce rent for the landlord...." Jerome D. Whalen, *Commercial Ground Leases* § 1.1.1, at 2, 5–6 (1988). Unfortunately for Oakwood, it evidently failed to secure from Albertsons any assurances that Albertsons would operate a grocery store on the premises for the duration of the lease.

¶ 41 Therefore, because the lease at issue is a ground lease, contains language that does not prohibit Albertsons from going dark, includes a right to raze, and indicates that both parties contemplated a scenario in which Albertsons would pay rent indefinitely on bare ground, we will not find an implied covenant of continuous operation as Oakwood asks us to do.

### B. Covenant of Good Faith and Fair Dealing

¶ 42 Oakwood's second major claim is that Albertsons breached the implied covenant of good faith and fair dealing in the lease. Even assuming that the lease gave Albertsons the right to go dark, Oakwood argues that Albertsons availed itself of this right for the improper purpose of shielding itself from competition with its new store. According to Oakwood, the obligation of good faith required Albertsons to exercise its discretion in a way that would not deny Oakwood the opportunity to receive the real consideration for the lease—the ability of Albertsons to generate consumer traffic for the center. Oakwood claims this covenant left Albertsons with three options: (1) to continue operating in the center, (2) to sublet or assign the lease to a comparable anchor tenant, or (3) to surrender possession of the premises to Oakwood so that Oakwood could relet them to an appropriate anchor tenant of its choice. Oakwood argues that Albertsons's failure to elect one of these options was bad faith.

¶ 43 In Utah, virtually every contract imposes upon each party a duty of good faith and fair dealing, the violation of which gives rise to a claim for breach of contract. *St. Benedict's,* 811 P.2d at 199–200. The obligation of good faith requires each party to refrain from actions that will intentionally "destroy or injure the other party's right to receive the fruits of the contract." *Id.* at 199. To determine the legal duty a contractual party has under this covenant, a court will assess whether a "party's actions [are] consistent with the agreed common purpose

and the justified expectations of the other party." *Id.* at 200. This court determines the "purpose, intentions, and expectations" by considering "the contract language and the course of dealings between and conduct of the parties." *Id.* Oakwood's complaint does not contain averments regarding the parties' course of dealings or conduct, focusing only on the contractual language.

¶ 44 Oakwood's reading of the lease would violate the established principle that "[i]f there is no express or implied covenant that tenant operate, a cessation of operation is no breach of the requirement to act in good faith." Friedman, *supra,* § 6:9, at 6–42. In addition, even setting aside that principle, Oakwood's construction of the obligation to act in good faith and deal fairly would violate other broader principles of contract interpretation.

¶ 45 While a covenant of good faith and fair dealing inheres in almost every contract, some general principles limit the scope of the covenant, as defendants correctly note. First, this covenant cannot be read to establish new, independent rights or duties to which the parties did not agree ex ante. *Brehany v. Nordstrom, Inc.,* 812 P.2d 49, 55 (Utah 1991). Second, this covenant cannot create rights and duties inconsistent with express contractual terms. *See id.; Rio Algom Corp. v. Jimco, Ltd.,* 618 P.2d 497, 505 (Utah 1980). Third, this covenant cannot compel a contractual party to exercise a contractual right "to its own detriment for the purpose of benefitting another party to the contract." *Olympus Hills Shopping Ctr. v. Smith's Food & Drug Ctrs.,* 889 P.2d 445, 457 n. 13 (Utah Ct.App. 1994). Finally, we will not use this covenant to achieve an outcome in harmony with the court's sense of justice but inconsistent with the express terms of the applicable contract. *See Dalton v. Jerico Constr. Co.,* 642 P.2d 748, 750 (Utah 1982).

¶ 46 Oakwood misreads the scope of the covenant of good faith and fair dealing in asking this court to infer a promise of continuous operation not supported by the language of the relevant contracts and, in fact, contradicting express provisions in them. Such a reading of the covenant would infringe on Albertsons's authorized freedom to exercise its expressly granted contractual rights. While Albertsons may not have followed the golden rule in pursuing the course of conduct it did, Albertsons did not act in bad faith or violate any other implied covenant in its contract with Oakwood.

¶ 47 Because Oakwood argues at length that the trial court's decision denying a claim for relief based on the implied covenant of good faith and fair dealing is inconsistent with this court's previous rulings, we address this reasoning. In particular, both parties recognize *St. Benedict's* and *Olympus Hills* as the controlling cases on the requirements and operation of the covenant of good faith and fair dealing.

¶ 48 In *St. Benedict's,* after finding no implied covenant of continuous operation, we described the requirements of the covenant of good faith and fair dealing and remanded the case for trial on that issue. 811 P.2d at 202. In that case, the hospital entered into a ground lease with the development company. *Id.* at 196. According to the terms of their lease, the development company would build two professional office buildings on the leased property expected to be occupied by medical practitioners using hospital facilities. *Id.* The lease expressly required the hospital to "actively assist" the development company "in acquiring and holding good tenants until such time as the New Office Building is completely occupied." *Id.* at 197. It also expressly guaranteed payment of rent by the hospital for one-third of the net leasable area of the building until the building was two-thirds occupied. *Id.* Subsequently, the hospital and a third-party developer announced their plan to construct another medical office building on property adjacent to the now existing two buildings. *Id.* After this announcement was made, several tenants declared to the developer of the existing buildings their intention to vacatee once the new facility was completed and would agree to pay rent only on a month-to-month basis in

anticipation of their imminent relocation. *Id.* Thereafter, the development company of the existing buildings brought suit against the hospital for, among other claims, breach of the implied covenants of continuous operation and good faith and fair dealing. *Id.* at 197–99. In reversing the lower court's decision on the case, this court concluded that the developer's showing that "the hospital[ ] encourag[ed] … a competing office building" was sufficient to state a claim against the hospital for breach of the covenant of good faith and fair dealing. *Id.* at 200.

¶ 49 We believe that *St. Benedict's* is distinguishable from the present case. In *St. Benedict's*, the lease contained express language imposing a legal duty on the hospital, whereas such language is conspicuously absent from the Albertsons lease. In reversing in the *St. Benedict's* case, we explained: "It is difficult to imagine a scenario where a party could be found to be 'diligently endeavoring' to obtain and retain tenants for one building while at the same time encouraging the solicitation of existing tenants for a competing building." *Id.* Thus, we found that the hospital had breached an express contract provision:

> "Here, the trial court did not specifically address the question of whether the hospital breached its express promise to aid the development company in acquiring and retaining tenants for the new office building. If it *had*, the court would have found that the complaint states a claim for such a breach. *Id.* at 199 (emphasis added).

There are no such provisions in the lease between Oakwood and Albertsons.

¶ 50 Similar to *St. Benedict's*, *Olympus Hills* involved a lease between a developer and a Smith's grocery store, which contained an express covenant of continuous operation that obliged Smith's to continuously operate "any lawful retail selling business." 889 P.2d at 451. Rather than defaulting on the lease, Smith's opened a warehouse box store in order to restrict competition with another grocery store it operated close to the Olym-

pus Hills Shopping Center. *Id.* at 448. Olympus Hills thereafter sued Smith's, claiming that Smith's had violated the covenant of good faith and fair dealing. *Id.* On appeal, the *Olympus Hills* court concluded that the jury had properly found that the circumstances and purpose of Smith's temporary closure had been inconsistent with the parties' justified expectations of continuous operation and was, in effect, a breach of its contractual rights. *Id.* at 450.

¶ 51 We disagree with Oakwood that the decision in *Olympus Hills* supports its claim. Smith's operation of a warehouse box store was deemed a breach of contract because the lease contained an express covenant of continuous operation and a restriction on the nature of operations. Here, Albertsons's lease contains neither a restrictive use nor a continuous operation provision and further grants Albertsons an unqualified right to sublet or assign its lease.

¶ 52 In sum, we find *St. Benedict's* and *Olympus Hills's* rulings to be consistent with the decision we reach today.

¶ 53 This lease is a complete and unambiguous agreement between competent commercial parties. Long-term commercial leases, by their nature, are risky. Neither side can foretell future market conditions with any certainty. We presume that both Oakwood and Albertsons bargained for the best terms and conditions each could get. Each party took the risk that unpredictable market forces would at some later day render the contractual terms unfavorable to themselves. Despite this risk, both parties willingly agreed to the terms in the lease. It is not our role to intervene now, construing the contract's unambiguous terms to mean something different from what the parties intended them to mean at the outset.

## CONCLUSION

¶ 54 Although we acknowledge the "dog in the manger" position that Albertsons has taken, we cannot conclude that the parties' agreement warrants finding for Oakwood.

What Albertsons did may not have been nice, but its conduct in vacating the leased premises while continuing to pay rent in order to restrict competition with its new store was not unlawful under the lease.

¶ 55 In urging this court to locate in the lease a legal duty that Albertsons has breached, Oakwood has stated that "[f]airness in business dealings should be a concern of this Court." It is precisely this concern for fairness, however, which bars us from reading into the lease an obligation that Oakwood failed to secure during contract negotiations. The duty Oakwood now seeks to impose on Albertsons is simply not one for which the parties bargained.

¶ 56 In addition, Oakwood asks this court to focus on the "big picture" rather than on specific textual provisions to which defendants call attention. The problem with Oakwood's approach, however, is that it relies on "unstated inferences as opposed to the actual language of the contract." *Forrest Drive Assocs.*, 72 F.Supp.2d at 583. By contrast, in relying on unambiguous contractual language, Albertsons's argument rests on a firmer foundation.

¶ 57 We affirm the trial court's judgment granting defendants' (Albertsons and One Hamilton's) motion to dismiss this case for failure to state a claim upon which relief can be granted pursuant to rule 12(b)(6) of the Utah Rules of Civil Procedure. We also affirm the trial court's order that Oakwood pay all of defendants' reasonable attorney fees covering the litigation costs of this case both at the trial level and on appeal, as the parties agreed to in their lease.

¶ 58 Justice DURRANT, Justice PARRISH, Justice NEHRING, and Judge TAYLOR concur in Chief Justice DURHAM'S opinion.

¶ 59 Having disqualified himself, Associate Chief Justice WILKINS does not participate herein; District Judge JAMES R. TAYLOR sat.