2007 UT App 379

**Douglas J. MARKHAM and Andrea Markham, Plaintiffs and Appellees,**

v.

**John J. BRADLEY and Darby G. Bradley, Defendants and Appellants.**

No. 20061022–CA.

Court of Appeals of Utah.

Nov. 23, 2007.

Justin D. Heideman and Justin R. Elswick, Provo, for Appellants.

Russell S. Mitchell, St. George, for Appellees.

Before Judges BILLINGS, McHUGH, and THORNE.

OPINION

McHUGH, Judge:

¶ 1 Appellants John Bradley and Darby Bradley (Sellers) appeal the trial court's judgment in favor of Appellees Douglas Markham and Andrea Markham (Buyers). After a bench trial, the trial court determined that Sellers breached the covenant of good faith and fair dealing by canceling the parties' Real Estate Purchase Contract (REPC) and ordered specific performance. We affirm.

## BACKGROUND

¶ 2 This suit arises out of a disagreement over the sale of property in Dammeron Valley, located in St. George, Utah (the Property). Buyers retained real estate agents Carolyn Norton and Stuart Shumway to find properties in the Washington County area. On August 28, 2004, Norton showed the Property to Buyers. When Norton and Buyers arrived at the Property, Mr. Bradley told them that his wife, who was listed as the "owner/agent" for the Property, was out of town and that all communications regarding the Property were to be directed to him.

¶ 3 On or about August 30, 2007, Mr. Markham and Mr. Bradley orally agreed on a purchase price of $550,000, part of which would be seller-financed. Mr. Markham asked Norton to prepare the REPC, specifying that the Seller Financing Addendum (SFA) would not include a prepayment penalty. Additionally, Addendum 1 to the REPC provided that Sellers would complete construction of the home and Buyers would make a trip to St. George in mid-September to meet with Sellers to discuss unresolved details.

¶ 4 When Norton and Shumway personally delivered the REPC to Mr. Bradley, they asked how they could contact Mrs. Bradley. Mr. Bradley did not give them her contact information, instead stating that he would forward everything to Mrs. Bradley in Bellingham, Washington. He also mentioned that Mrs. Bradley was seeking a divorce.

¶ 5 Sellers made a counteroffer, which Buyers accepted. After delivering a copy of the fully executed REPC to Mr. Bradley, Norton scheduled a follow-up meeting for September 12, 2004 (the September 12 meeting). Norton selected that date because the deadline for producing Buyers' financial information to Sellers was September 13, 2004 (the September 13 deadline). Prior to the September 12 meeting, Norton had several conversations with Mr. Bradley confirming the meeting. During those discussions, Mr.

Bradley asked for an extension of the contract. A few days later, when Norton delivered the extension addendum, she reconfirmed and emphasized "the critical nature of the September 12 meeting."

¶ 6 Norton instructed Buyers to "bring all [of their] financial information" to the September 12 meeting. However, Mr. Markham testified that Norton did not specifically tell him to bring a credit report. Also, Norton discovered that on September 9, the Multiple Listing Service (MLS) listing had been altered by Sellers to show a "withdrawn" status—as opposed to "pending," which is the normal practice when a property is under contract. Around 4:30 or 5:00 p.m. on September 12, Buyers and Norton went to the Property. Upon their arrival, Mr. Bradley greeted them angrily, yelling at Norton, "What in the hell are you doing here?" Mr. Bradley later testified that he did not know about the September 12 meeting. Eventually, Mr. Bradley allowed Norton and Buyers inside. When Mr. Markham entered, he removed the following documents from his briefcase: a statement from an unrelated financial transaction and bank records so he could transfer financial and other account information to a form chosen by Sellers, and a sample financial statement that Sellers could choose if they found it acceptable. Mr. Bradley refused to take, or even look at, Buyers' documentation, explaining that it was "not a good time for [him]" to discuss Buyers' financial information and that he would deal with it "in a couple of weeks." Buyers, Norton, and Shumway then left the Property.[1]

¶ 7 Over the next few weeks, Norton attempted several times to schedule another meeting. Despite visiting Mr. Bradley's work sites and home, she was unable to contact Sellers. Approximately one week later, on September 20, Norton received a cancellation notice from Sellers claiming that they were "declar[ing] [the REPC] null and void" based on the fact that Buyers had

---

1. Norton testified that before leaving the Property on September 12, she called her assistant, who incorrectly told her that the deadline to deliver Buyers' financial information to Sellers was September 30. The trial court did not view this fact as determinative, instead finding that it was just one reason for Buyers' failure to meet the deadline, the other being that "Mr. Bradley had refused to look at anything."

failed to provide the required financial information by the September 13 deadline. When Norton called Mr. Bradley about the letter, he gave Norton Mrs. Bradley's phone number and stated that Mrs. Bradley wanted to cancel the REPC and live on the Property. When Norton called, Mrs. Bradley stated that she "never wanted to sell the Property" and would not sell it now.

¶ 8 After learning of Sellers' cancellation letter, Buyers immediately assembled their financial information, including a credit report,[2] and faxed it to Norton, who then forwarded it to Mrs. Bradley on September 24, 2004. Because of the rush, some of the documents were out of order, and Mr. Markham had used white-out to update an old financial statement. Norton also faxed Sellers a letter explaining that Buyers still intended to purchase Sellers' property, had obtained their own financing, and were therefore ready, willing, and able to close in accordance with the REPC.

¶ 9 Sellers received the faxed information but instructed their attorney to send another cancellation notice, which claimed that Sellers were excused from closing under the REPC due to Buyers' failure to meet the September 13 deadline and the fact that Buyers' documentation was "sloppy" and sometimes "illegible." The letter also indicated that Sellers were "concerned" with the prior bankruptcy or judgment.

¶ 10 Buyers then brought a breach of contract claim against Sellers.[3] After a bench trial, the trial court entered judgment in

favor of Buyers and ordered specific performance in compliance with the terms of the REPC. The trial court concluded that due to the impending divorce, Sellers changed their minds after signing the REPC. The trial court further found that Sellers prevented Buyers from meeting the September 13 deadline and rejected the subsequently provided financial information as a pretext for canceling the contract. The trial court ruled that the rejection of the financial information was objectively unreasonable, thereby breaching the covenant of good faith and fair dealing. Thus, the trial court concluded both that the subjective intent of Sellers was to create a pretext that would allow them to void the REPC and that the rejection of the financial information was objectively unreasonable. The court ordered Buyers to pay the purchase price of $550,000, less the attorney fees and costs that they had incurred.[4]

¶ 11 Sellers then filed several post-trial motions, including a motion for a new trial, which was denied. This appeal followed.

## ISSUES AND STANDARDS OF REVIEW

¶ 12 First, Sellers challenge the trial court's application of an objective legal standard to the issue of whether they breached the covenant of good faith and fair dealing when they rejected the financial information provided by Buyers.[5] We review a trial court's legal determinations for correctness, granting no deference to the trial court's conclusions of law. *See State v. Deli*, 861

---

2. Buyers' credit report shows credit scores of 689 and 705. It also indicates four instances of late payments, all thirty days late, twice in 2003 and twice in 2001. The credit report did not reference any bankruptcy or judgments; however, the financial statement indicated a bankruptcy. Trial testimony established that Mr. Markham filed this bankruptcy over ten years earlier due to a business deal in a shared chiropractic office.

3. After Buyers presented their case, Sellers moved for a directed verdict. The trial court, properly treating it as a motion to dismiss, denied Sellers' motion on the ground that Buyers "made at least a prima facie case ... that [Sellers] did not act in good faith."

4. Before trial, Buyers obtained an injunction prohibiting Sellers from transferring or damaging the Property. Sellers violated this order by

depositing over 300 loads of excavation material on the Property. At the time of trial, approximately 100 truckloads remained with the cost of removal estimated at $30,000. The trial court found Sellers in contempt and ordered that they "complete construction of the home on the Property" as required by the REPC and place $30,000 of the purchase price "in escrow pending the restoration of the Property to its condition at the time the Court entered its Restraining Order and Preliminary Injunction."

5. Although Buyers contend otherwise, we conclude that this issue was adequately preserved by Sellers' argument at trial that they could subjectively determine whether or not they were satisfied with the financial information.

P.2d 431, 433 (Utah 1993); *Standard Fed. Sav. & Loan Ass'n v. Kirkbride*, 821 P.2d 1136, 1137 (Utah 1991).

¶ 13 Second, Sellers seek review of the trial court's denial of their motions for a directed verdict and new trial on the ground that "the trial court's specific factual findings ... are insufficient to support the legal conclusion that [Sellers'] decision to not loan money to [Buyers] breached the covenant of good faith and fair dealing." Under the Utah Rules of Civil Procedure, a motion for a directed verdict submitted during a bench trial is treated as a motion for involuntary dismissal. *See* Utah R. Civ. P. 41(b), 50(a); *In re Trujillo*, 2001 UT 38, ¶ 21 n. 13, 24 P.3d 972 ("[A] motion for a directed verdict contemplates only jury trials. In the context of a bench trial, the directed verdict's procedural counterpart is a motion for involuntary dismissal under rule 41(b) ...." (citation omitted)). When reviewing the denial of a motion for involuntary dismissal, an appellate court should defer to the trial court's findings and inferences under a clearly erroneous standard and review the trial court's conclusions of law for correctness. *See Southern Title Guar. Co. v. Bethers*, 761 P.2d 951, 954 (Utah Ct.App.1988) (citing *State v. Walker*, 743 P.2d 191, 193 (Utah 1987); *Wessel v. Erickson Landscaping Co.*, 711 P.2d 250, 253 (Utah 1985)).[6]

¶ 14 Sellers also appeal the trial court's denial of their motion for a new trial. Generally, "[a] trial court has discretion in determining whether to grant or deny a motion for a new trial, and [appellate courts] will not reverse a trial court's decision absent clear abuse of that discretion." *State v. Harmon*, 956 P.2d 262, 266 (Utah 1998) (citing *State v. Wetzel*, 868 P.2d 64, 70 (Utah 1993); *State v. Thomas*, 830 P.2d 243, 245 (Utah 1992)); *see also Mann v. Fredrickson*, 2006 UT App 475, ¶ 5, 153 P.3d 768 ("Generally, [a] large measure of discretion is vested in the trial court in refusing or granting a motion for new trial on the ground that there is an insufficiency of the evidence to support the verdict and judgment. We give such discretion to the trial court because of its

superior position to evaluate first-hand the witnesses' testimony and other evidence presented at trial." (alteration in original) (internal quotation marks and citation omitted)); *Okelberry v. West Daniels Land Ass'n*, 2005 UT App 327, ¶ 20 n. 14, 120 P.3d 34 (using abuse of discretion standard of review in the context of a rule 59(a) motion, which the trial court denied after a bench trial).

¶ 15 Next, Sellers argue that the trial court erred in determining that they are estopped from asserting or have waived the September 13 deadline by which Buyers were to provide them with financial information. Sellers also contend that any such extension had to be in writing to satisfy both the REPC and the statute of frauds. " '[I]nterpretation of the terms of a contract is a question of law. Thus, we accord the trial court's conclusions regarding the contract no deference and review them for correctness.' " *Advanced Restoration, LLC v. Priskos*, 2005 UT App 505, ¶ 18, 126 P.3d 786 (quoting *Nova Cas. Co. v. Able Constr., Inc.*, 1999 UT 69, ¶ 6, 983 P.2d 575). Appellate courts review the issue of waiver as a mixed question of law and fact: " '[W]hether the trial court employed the proper standard of waiver presents a legal question which is reviewed for correctness, but the actions or events allegedly supporting waiver are factual in nature and should be reviewed as factual determinations.' " *United Park City Mines Co. v. Stichting Mayflower Mountain Fonds*, 2006 UT 35, ¶ 21, 140 P.3d 1200 (alteration in original) (quoting *Pledger v. Gillespie*, 1999 UT 54, ¶ 16, 982 P.2d 572). We "grant broadened discretion to the trial court's findings." *Id.* (internal quotation marks omitted).

¶ 16 Finally, Sellers argue that the trial court erred in ordering specific performance as the appropriate remedy for Sellers' breach. We agree with Buyers that this issue has not been adequately preserved and therefore do not address it. *See Brookside Mobile Home Park, Ltd. v. Peebles*, 2002 UT 48, ¶ 14, 48 P.3d 968 ("[I]n order to preserve an issue for appeal the issue must be pre-

---

**6.** Although Sellers attack the trial court's conclusions, they do not challenge any of the underlying factual findings. Therefore, we accept each of those findings as true.

sented to the trial court in such a way that the trial court has an opportunity to rule on that issue." (citing *Badger v. Brooklyn Canal Co.*, 966 P.2d 844, 847 (Utah 1998))). Although Sellers argued to the trial court that the REPC was "unenforceable, and ... therefore [Buyers] are not entitled to ... specific performance," they did not challenge specific performance as an appropriate remedy in the event the contract was found to be enforceable.[7]

## ANALYSIS

### I. Objective Reasonableness of Sellers' Conduct

¶ 17 Sellers argue that because the REPC "specifically granted [Sellers] the right to be subjectively dissatisfied with [Buyers'] credit information," the trial court erred in using an objective standard in its evaluation of whether Sellers breached the covenant of good faith and fair dealing. Sellers contend that "[s]ection 8.1 of the REPC altered the traditional common law rule," giving them a right to decline to loan money to Buyers if they are "subjectively dissatisfied with [Buyers'] credit." Under the facts of this case, we disagree.

¶ 18 The implied covenant of good faith and fair dealing (the covenant) inheres in every contract. *See Eggett v. Wasatch Energy Corp.*, 2004 UT 28, ¶ 14, 94 P.3d 193 (citing, as examples, *CIG Exploration, Inc. v. State*, 2001 UT 37, ¶ 19, 24 P.3d 966; *Malibu Inv. Co. v. Sparks*, 2000 UT 30, ¶ 19, 996 P.2d 1043). As distinguished from a contract's express terms, the covenant "is based on judicially recognized duties not found within the four corners of the contract." *Christiansen v. Farmers Ins. Exch.*, 2005 UT 21, ¶ 10, 116 P.3d 259 (citing *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 798 (Utah 1985)). "Under [the covenant], both parties to a contract impliedly promise not to inten-

tionally do anything to injure the other party's right to receive the benefits of the contract." *Eggett*, 2004 UT 28, ¶ 14, 94 P.3d 193. Furthermore, the "covenant ... should prevent either party from impeding the other's performance of his obligations [under the contract]; and ... one party may not render it difficult or impossible for the other to continue performance and then take advantage of the non-performance he has caused." *Zion's Props., Inc. v. Holt*, 538 P.2d 1319, 1321 (Utah 1975) (footnote omitted); *see also Advanced Restoration*, 2005 UT App 505, ¶ 34, 126 P.3d 786; *PDQ Lube Ctr., Inc. v. Huber*, 949 P.2d 792, 798 (Utah Ct.App.1997). Generally, whether a party to a contract has acted reasonably "is an objective question to be determined without considering the [party's] subjective state of mind." *Billings v. Union Bankers Ins. Co.*, 918 P.2d 461, 465 n. 2 (Utah 1996) (considering whether insurer acted in bad faith); *see also Canyon Country Store v. Bracey*, 781 P.2d 414, 421 n. 6 (Utah 1989) ("[B]reach of the covenant of good faith and fair dealing is an objective question.").

¶ 19 The issue Sellers raise on appeal is the extent to which the express language of the contract negated the protections provided by the covenant. Typically, the duties imposed by the covenant, "unlike the duties expressly stated in the contract, are not subject to alteration by the parties." *Christiansen*, 2005 UT 21, ¶ 10, 116 P.3d 259; *see also Beck*, 701 P.2d at 801 n. 4 (stating that the duty to perform contract in good faith cannot be waived by either party). However, the application of the covenant is limited by some general principles:

First, this covenant cannot be read to establish new, independent rights or duties to which the parties did not agree ex ante. Second, this covenant cannot create rights and duties inconsistent with express contractual terms. Third, this covenant cannot compel a contractual party to exercise

---

7. Indeed, the REPC expressly states: "If Seller defaults, in addition to return of the Earnest Money Deposit, Buyer may elect either to accept from Seller a sum equal to the Earnest Money Deposit as liquidated damages, or may sue Seller to specifically enforce this Contract or pursue other remedies available at law." Furthermore, where one party interferes with the other's per-

formance, that party cannot invoke that nonperformance as a defense to specific performance. *See PDQ Lube Ctr., Inc. v. Huber*, 949 P.2d 792, 799 (Utah Ct.App.1997) (concluding that specific performance is the proper remedy where plaintiff's deficient performance was caused by defendant's bad faith).

a contractual right "to its own detriment for the purpose of benefitting another party to the contract." Finally, we will not use this covenant to achieve an outcome in harmony with the court's sense of justice but inconsistent with the express terms of the applicable contract.

*Oakwood Vill. LLC v. Albertsons, Inc.*, 2004 UT 101, ¶ 45, 104 P.3d 1226 (citations omitted) (quoting *Olympus Hills Shopping Ctr., Ltd. v. Smith's Food & Drug Ctrs., Inc.*, 889 P.2d 445, 457 n. 13 (Utah Ct.App.1994)). Sellers argue that the imposition of an objective reasonableness standard here violates all four of the above-quoted principles. Again, we disagree.

¶ 20 In *Olympus Hills Shopping Center, Ltd. v. Smith's Food & Drug Centers, Inc.*, 889 P.2d 445 (Utah Ct.App.1994), this court held that even where a contract expressly provides a privilege to one party, the exercise of that right is subject to the covenant of good faith and fair dealing. *See id.* at 450. "[A] party must exercise express rights awarded under a contract reasonably and in good faith." *Id.; see also Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 311 (Utah 1982) (stating that a party breaches the covenant if it fails to exercise all rights under the contract reasonably).

¶ 21 Where the contract allows discretion but does not provide any express standard for exercising that discretion, the covenant imposes an objective standard of reasonableness. If, on the other hand, the parties have bargained for the precise formula or test under which discretion will be exercised, the court cannot use the covenant to add to or alter the terms of that express agreement between the parties. "[T]he degree to which a party to a contract may invoke the protections of the covenant turns on the extent to which the contracting parties have defined their expectations and imposed limitations on the exercise of discretion through express contract terms." *Smith v. Grand Canyon Expeditions Co.*, 2003 UT 57, ¶ 20, 84 P.3d 1154 (citing *Sparks*, 2000 UT 30, ¶ 19, 996 P.2d 1043).

¶ 22 We now examine the actual language of the contract to determine the scope of the covenant in this case. Section 8.1 of the SFA states: "If the content of the credit report or the Buyer Disclosures is not acceptable to Seller, Seller may elect to ... immediately cancel the REPC...." By its terms, the REPC provides Sellers with discretion to reject the contract if Buyer' disclosures are "not acceptable." It does not, however, set forth any criteria under which Sellers must exercise that discretion. Consequently, the covenant will impose an objective standard of reasonableness upon Sellers' exercise of their discretion under section 8.1 of the SFA. "Broadly speaking, the more leeway a party has under the terms of the contract, the more contracting parties may invoke the protections of the covenant of good faith and fair dealing in the exercise of that discretion." *Eggett*, 2004 UT 28, ¶ 16, 94 P.3d 193.

¶ 23 Indeed, the interpretation urged by Sellers, that there are no limits on the right to reject the financial information, would render their promise to sell illusory.

[T]he tendency of the law is to avoid the finding that no contract arose due to an illusory promise when it appears that the parties intended a contract. Through a process of interpretation, in the absence of express restrictions, courts find implied promises to prevent a party's promise from being performable merely at the whim of the promisor.

*Peirce v. Peirce*, 2000 UT 7, ¶ 21, 994 P.2d 193 (internal quotation marks omitted); *see also Resource Mgmt. Co. v. Western Ranch & Livestock Co.*, 706 P.2d 1028, 1037 (Utah 1985) ("[C]ourts ... construe contracts so as not to grant one of the parties an absolute and arbitrary right to terminate a contract.").

¶ 24 Furthermore, because no standard has been expressly set forth in the REPC, the imposition of a standard of objective reasonableness does not run afoul of the express contract terms. *See Oakwood Vill. LLC v. Albertsons, Inc.*, 2004 UT 101, ¶ 45, 104 P.3d 1226 (stating that the covenant may not imply new or inconsistent terms). For the same reason, the trial court was not imposing its own "sense of justice" in a manner "inconsistent with the express terms of the applicable contract." *Id.* The REPC did not contain

limits on the exercise of Sellers' discretion in evaluating Buyers' financial information. Consequently, Sellers were given great leeway under the REPC, thereby providing Buyers the opportunity to "invoke the protections of [the covenant] in the exercise of that discretion." *Eggett v. Wasatch Energy Corp.*, 2004 UT 28, ¶ 16, 94 P.3d 193.

¶ 25 Finally, Sellers argue that the trial court's decision would compel them to exercise their contractual right "to [their] own detriment for the purpose of benefitting another party to the contract." *Oakwood Vill.*, 2004 UT 101, ¶ 45, 104 P.3d 1226 (internal quotation marks omitted). Under the facts of this case, we are unpersuaded. The trial court found that Buyers had a committed lender ready to fund the transaction immediately upon closing. Thus, Sellers were no longer expected to finance the transaction. Furthermore, because Buyers had negotiated for an express term in the REPC providing for no penalty upon early prepayment, Sellers did not have a reasonable expectation that interest payments would be part of their bargain.

¶ 26 We hold that, under the facts of this case, the trial court was correct in imposing an objective standard of reasonableness to assess whether Sellers breached the covenant when they rejected Buyers' financial information.

## II. Motions for Involuntary Dismissal and New Trial

¶ 27 Sellers assert that the trial court erred when it denied their motions for involuntary dismissal and new trial, each of which claimed that there was insufficient evidence to support the determination that Sellers breached the duty of good faith and fair dealing. Sellers specifically argue that the court's conclusion was against the clear weight of the evidence and that "a reasonable person could not disagree that [Sellers'] decision to cancel the REPC, based on legitimate concerns over [Buyers'] financial information, was undertaken in good faith." [8] We disagree.

¶ 28 Sellers argue that their motion for involuntary dismissal should have been granted on the basis of Buyers' bankruptcy alone. After hearing Buyers' evidence, the trial court denied Sellers' motion to dismiss because it found that Buyers had established a prima facie case. Specifically, the trial court found that Buyers had presented evidence that could support a finding that they could have performed by the September 13 deadline, but for Mr. Bradley's actions. The trial court stated that "it[ is a] reasonable inference from the evidence given [during Buyers' case-in-chief] that further efforts with Mr. Bradley, either on the [twelfth] or on the [thirteenth] for that matter, would have been id[le] efforts because Mr. Bradley had said not to talk to him about it for 'a couple of weeks.'" Because the trial court found that Buyers had made out a prima facie case that Sellers had breached the covenant, it also ruled that it could not assume that the remedy of cancellation of the contract "was available to [Sellers based] on the evidence that [it had] so far." The trial court correctly noted that, in the context of a motion for involuntary dismissal, "[it] is not in a position to weigh the evidence or judge the credibility of the evidence given." Therefore, we hold that the trial court was correct in denying the motion for involuntary dismissal.

¶ 29 Sellers base their argument for a new trial on rule 59(a)(6) of the Utah Rules of Civil Procedure, which allows a court to grant a new trial due to "[i]nsufficiency of the evidence to justify the verdict or other decision." Utah R. Civ. P. 59(a)(6). Again, Sellers do not challenge the findings of fact but contend that those findings do not support the conclusions as a matter of law. Upon review of the detailed factual findings, we are unpersuaded by Sellers' argument.

¶ 30 The trial court relied on the following facts in determining that Sellers acted in bad faith by using the missed deadline and financial information as a pretext to cancel the REPC: (1) Mr. Bradley—not Mrs.

---

**8.** Sellers do not challenge any of the facts found by the trial court, instead arguing that the facts do not support the trial court's conclusions. In-

deed, Sellers' counsel reiterated this during oral argument.

Bradley, who was acting as Sellers' real estate agent—would be the person "handling the paperwork," and "all communication and documents" would go through him; (2) Mr. Bradley, who was aware of the September 12 meeting and its purpose of going over Buyers' financial information, "refused to take the [financial] documents and said that he did not want anyone to talk to him about it for 'a couple of weeks'"; (3) although Buyers' credit report and other financial documents were due to Sellers by the September 13 deadline, pursuant to sections 21 and 24 of the REPC and section 8 of the SFA, "[i]t would have been a futile act for [Buyers] and their real estate agents to continue to try to present the financial information to Mr. Bradley on Monday, September 13, after his angry refusal on Sunday afternoon";[9] (4) Mrs. Bradley told Norton "that she 'never wanted to sell the Property, anyway'"; (5) Sellers "testified that they had no objection to the information on the [credit] report showing [Buyers'] monthly income or their net worth or their credit scores," and Buyers' "credit report shows only four [thirty-day] delinquencies," half from 2003 and the rest from 2001; and (6) Buyers' credit scores "were sufficient for Countrywide to qualify [them] for a loan for twice the amount that [Sellers] agreed to finance," Buyers "had lined up Countrywide to immediately pay off the seller financing," and "Countrywide did not consider [a] ten—or twelve-year-old bankruptcy to disqualify [Buyers]." In addition to these findings, the trial court made specific credibility determinations:[10] Buyers' and their agents' testimony is "credible" and their affidavits "reliable," while "[t]he testimony of Mr. Bradley on the critical facts is not credible, but is unreliable"; he "may have given false testimony at trial to fit a legal theory or … withheld information and truthful responses during his deposition"; and "Mrs. Bradley's testimony lacks credibility as well."

¶ 31 Sellers argue that the trial court's judgment for Buyers—specifically that Sellers did not evaluate Buyers' financial information in an objectively reasonable manner—was against the clear weight of the evidence. Besides the bankruptcy, Sellers point to "many other undisputed, negative elements of [Buyers'] credit information that justified [their] decision to not loan [Buyers] $265,000." However, the trial court specifically found that those other reasons—i.e., late payments and sloppy paperwork—were disingenuous based on the fact that Buyers had "high credit scores"; a lender "to immediately pay off the seller financing," for which Sellers "did not have any contractual expectation"; and a "small and insignificant number of delinquen[t payments]." Furthermore, the court noted that the "sloppy" appearance of the paperwork "had nothing to do with the merits of the information provided."

¶ 32 Sellers also argue that, even assuming an objective standard of reasonableness was appropriate, they should not have been held to "an objective professional lender standard to evaluate the reasonableness of [Sellers'] decision to not loan money to [Buyers]." However, the trial court made a specific finding that Sellers did not evaluate Buyers' credit information in good faith because they had already decided—before they even received it—that they no longer wanted to sell the Property. The court's reference to the fact that Countrywide had committed to loan twice as much money to Buyers as originally contemplated by the seller financing provisions of the REPC was simply additional evidence it considered in reaching the conclusion that the rejection of the financial information was a pretext. Nowhere does the court suggest that Sellers were required to meet a professional lender standard in fulfilling their obligations under the covenant, nor do we impose such an obligation.

9. Although the trial court found that Buyers did not have a credit report with them at the September 12 meeting, it also found that Buyers "informed Mr. Bradley that they had all of the necessary information to request and print out a credit report the next morning on September 13."

10. "[I]t is the trial court's role to assess witness credibility, given its advantaged position to observe testimony first hand, and normally, we will not second guess the trial court's findings in this regard." *ProMax Dev. Corp. v. Mattson*, 943 P.2d 247, 255 (Utah Ct.App.1997).

¶ 33 There was evidence to support the trial court's finding that Sellers "did not rely on credit worthiness issues" when they canceled the REPC because "[b]y the time [Sellers] had sent the first [cancellation] notice on September 20, 2004, they had determined they no longer wanted to sell the Property to [Buyers]." Also supporting this conclusion is the court's undisputed factual finding regarding the MLS listing:

> [O]n September 9, three days before the scheduled meeting with [Sellers] at the Property, Mr. Bradley had already initiated a change to the MLS listing to show it as "withdrawn," and not showing that it was under a pending sales contract. Norton was surprised to discover this, because the normal practice in Washington County is to alter the MLS listing to show that a sale is "pending" while it is under contract as was this one.

The above findings lend sufficient evidentiary support to the trial court's conclusion that Sellers acted in bad faith when they canceled the REPC.

¶ 34 Sellers also argue that their subjective motivation for canceling the REPC is irrelevant to the inquiry of whether they breached the covenant. They contend that, if an objective standard of reasonableness is appropriate, their subjective intent should not be considered. Again, we disagree. In *Olympus Hills*, we explained that:

> "The good faith performance doctrine may be said to permit the exercise of discretion for any purpose—including ordinary business purposes—reasonably within the contemplation of the parties. *A contract thus would be breached by a failure to perform in good faith if a party uses its discretion for a reason outside the contemplated range*—a reason beyond the risks assumed by the party claiming the breach."

*Olympus Hills Shopping Ctr., Ltd. v. Smith's Food & Drug Ctrs., Inc.*, 889 P.2d 445, 451 (Utah Ct.App.1994) (emphasis added) (quoting Steven J. Burton, *Breach of Contract and the Common Law Duty to Perform in Good*

*Faith,* 94 Harv. L.Rev. 369, 385–86 (1980)). The trial court found that Sellers exercised their discretion for a reason outside the contemplated range: using the missed deadline and the state of the financial information as a pretext because they had previously changed their minds about selling the Property. Sellers have not challenged these findings on appeal, and we reject their argument that their subjective intent is irrelevant to the determination of whether they acted in bad faith.[11]

¶ 35 Based on the foregoing analysis, the trial court did not exceed its discretion in denying Sellers' motion for a new trial, because the unchallenged findings of fact support the conclusion that Sellers breached the covenant.

### III. Effect of Sellers' Interference with Buyers' Performance

¶ 36 Sellers argue that they "did not waive their right to strictly enforce the September 13 deadline" because (1) the trial court erred by finding that Sellers intended to waive the deadline and (2) such an extension of the REPC was not in writing as required by both the express terms of the REPC and the statute of frauds. Sellers also argue that, as a matter of law, they are not estopped from enforcing the September 13 deadline. We hold that, under the facts of this case, Sellers could not rely on the missed deadline to cancel the REPC.

¶ 37 The trial court found that Mr. Bradley "refused to take any of [the financial information] or even look at it" and that he told Buyers that "he would deal with it in 'a couple of weeks.'" The trial court also found that, rather than meeting with Buyers in a couple of weeks, Sellers attempted to cancel the REPC on the ground that Buyers had missed the September 13 deadline. After assessing the credibility of the witnesses, the trial court also found that Mrs. Bradley admitted that she "never wanted to sell the Property, anyway" and was "not gong to sell the Property now." The trial court conclud-

---

11. We note that in the context of insurance bad faith cases, a finding of bad faith "is a subjective question of state of mind." *Canyon Country Store v. Bracey,* 781 P.2d 414, 421 n. 6 (Utah 1989) (stating that a finding of breach of the covenant is based upon an objective standard, while a finding that insurer acted in bad faith is based upon a subjective standard).

ed that "due to Mr. Bradley's refusal to talk about the issue and Mrs. Bradley's refusal to make herself available, [Sellers] are estopped to rely on the September 13 deadline; it would be inequitable to allow [Sellers] to take advantage of their own obstructive and misleading conduct." The trial court also held that, by their conduct, Sellers had waived strict compliance with the deadline.

¶ 38 Sellers argue that neither waiver nor estoppel is supported by these facts. However, the covenant prevents either party to a contract from making the other party's performance difficult or impossible and then taking advantage of the nonperformance it has caused. *See, e.g., Zion's Props., Inc. v. Holt*, 538 P.2d 1319, 1321 (Utah 1975); *Advanced Restoration, LLC v. Priskos*, 2005 UT App 505, ¶ 34, 126 P.3d 786; *PDQ Lube Ctr., Inc. v. Huber*, 949 P.2d 792, 798 (Utah Ct.App.1997). Furthermore, the inability to enforce a contract term due to one's own interference with its performance is not an amendment to the contract that is subject to the statute of frauds.

> Sometimes the resulting disability has been characterized as an estoppel, sometimes as a waiver. . . . We need not go into the accuracy of the description. . . . The truth is that we are facing a principle more nearly ultimate than either waiver or estoppel, one with roots in the yet larger principle that no one shall be permitted to found any claim upon his own inequity or take advantage of his own wrong. . . . The statute of frauds was not intended to offer an asylum of escape from that fundamental principle of justice.

*Bamberger Co. v. Certified Prods., Inc.*, 88 Utah 194, 48 P.2d 489, 492 (1935) (internal quotation marks omitted) (alterations in original), *cited favorably in White v. Fox*, 665 P.2d 1297, 1301 (Utah 1983).

¶ 39 We hold that the trial court's conclusion—that, as a result of their interference with Buyers' performance, Sellers are barred from enforcing the September 13 deadline—is supported by the findings of fact. We further hold that this bar is the result of the operation of contract principles and not the effect of an attempt to orally modify the

REPC. Consequently, the statute of frauds is not a valid defense.

## CONCLUSION

¶ 40 The trial court did not err in considering the reasonableness of Sellers' conduct under an objective standard for purposes of determining whether Sellers breached the covenant of good faith and fair dealing. We further hold that the trial court did not err in denying the motion for involuntary dismissal at the close of Buyers' case-in-chief or in denying Sellers' motion for a new trial. Finally, we conclude that the trial court was correct in refusing to allow Sellers to rely on the September 13 deadline where Sellers' own conduct interfered with Buyers' performance. Buyers are awarded their attorney fees on appeal; therefore, we remand this matter to the trial court to determine the reasonable amount of attorney fees and costs that Buyers incurred in connection with this appeal.

¶ 41 Affirmed.

¶ 42 WE CONCUR: JUDITH M. BILLINGS and WILLIAM A. THORNE JR., Judges.