RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0049p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

RICHARD L. KINZEL, Individually and as Trustee of the
Richard L. Kinzel Revocable Trust; JUDITH A. KINZEL,
Individually and as Trustee of the Judith A. Kinzel
Revocable Trust,

　　　　　　　　　　　*Plaintiffs-Appellants,*

　　　　　　*v.*

BANK OF AMERICA, et al.,

　　　　　　　　　　　*Defendants,*

MERRILL LYNCH BANK U.S.A.; MERRILL LYNCH,
PIERCE, FENNER AND SMITH, INC.; MERRILL LYNCH
BANK & TRUST COMPANY; BANK OF AMERICA
CORPORATION,

　　　　　　　　　　　*Defendants-Appellees.*

No. 16-3355

---

Appeal from the United States District Court for
the Northern District of Ohio at Toledo.
No. 3:10-cv-02169—Jeffrey James Helmick, District Judge.

Argued:　January 25, 2017

Decided and Filed:　March 2, 2017

Before:　BOGGS, GILMAN, and DONALD, Circuit Judges.

---

## COUNSEL

**ARGUED:** W. Patrick Murray, MURRAY & MURRAY, CO., L.P.A., Sandusky, Ohio, for
Appellants. Matthew A. Fitzgerald, MCGUIREWOODS LLP, Richmond, Virginia, for
Appellees. **ON BRIEF:** W. Patrick Murray, Dennis E. Murray, Jr., William H. Bartle,
MURRAY & MURRAY, CO., L.P.A., Sandusky, Ohio, for Appellants. Matthew A. Fitzgerald,
Lena L. Busscher, MCGUIREWOODS LLP, Richmond, Virginia, for Appellees.

---

**OPINION**

---

BOGGS, Circuit Judge.   The ticker symbol for Cedar Fair Entertainment Company—operator of Cedar Point and other amusement parks—is, fittingly, "FUN," and it thus reveals little about the nature of the collateral-liquidation dispute presently before us.

In April 2008, Richard Kinzel, then CEO of Cedar Fair, borrowed nearly $8,000,000 from Merrill Lynch to finance his exercise of FUN stock options and to pay the estimated income and payroll taxes that would be due immediately upon exercise.   To secure the loan, Kinzel pledged as collateral various assets, including the shares of FUN that he would be acquiring, and Kinzel entered into a Loan Management Account (LMA) agreement that allowed Merrill Lynch, "in its sole discretion and without prior notice," to "liquidate" the collateral upon any of twelve events, including "if the value of the . . . collateral is in the sole judgment of [Merrill Lynch] insufficient."

The stock market then crashed.   Along the way, the market value of FUN tumbled from the exercise price of $23.19 per share in April 2008 to $6.99 per share on March 2, 2009.   Having set a $7.00-per-share "trigger" to liquidate shares of FUN, the Merrill Lynch account managers responsible for Kinzel's account began selling off shares on March 3, 2009, without advance notice to Kinzel and without first making demand upon Kinzel for repayment of the loan.

Upset that his long-time bank would sell his shares of FUN even though he was "doing everything right," Kinzel (and his wife, both individually and as trustees of trusts in their names) sued Merrill Lynch (and Bank of America, which acquired Merrill Lynch in 2009) on various theories, including breach of contract and breach of the covenant of good faith and fair dealing. The Kinzels now appeal two district-court decisions: the court's denial of leave to file a third amended complaint to reassert a breach-of-contract claim that did not survive a previous motion to dismiss, and the court's final judgment in favor of Merrill Lynch on the breach-of-good-faith

claim, which the court entered following a bench trial on that claim only.  For the reasons that follow, we affirm.

I

*Kinzel's Loan Management Account*

When Kinzel exercised his stock options on April 15, 2008, he purchased 640,000 shares of FUN at the option price of $6.03 per share and 10,000 shares at the option price of $20.60 per share, for a total of 650,000 shares at a purchase price of $4,065,200.  Because the market value of FUN at the time of exercise was $23.19 per share, Kinzel's purchase was worth $15,073,500—meaning that Kinzel immediately realized a gain of $11,008,300.  Because the difference between option price and market value is treated as income rather than capital gains and is thus taxable immediately upon exercise, Kinzel also had to pay the estimated income and payroll taxes on his $11,008,300 gain, which amounted to $4,893,189.35.  Kinzel thus had to pony up $8,958,389.35 (the stock-option purchase price plus the tax liability) in order to exercise his options.  And for that, Kinzel needed a loan.

Rather than exercising his stock options on margin, Kinzel opened an $8,000,000 line of credit with Merrill Lynch and executed the LMA agreement.  (Kinzel borrowed $7,681,482.84 against the line of credit and paid the remainder of the purchase price out of other funds.)  The LMA is a flexible lending product that allows the borrower to draw against a line of credit with no payment schedule or due dates and at low interest rates—Kinzel's rate hovered around 2.6% per annum, for example—but allows the bank to require repayment in full at any time, on the bank's demand.  For reasons not germane to this appeal, Kinzel arranged for two trusts to be the borrowers (one trust bearing his name and the other bearing his wife's name, of which Kinzel and his wife were trustees, respectively), but for Kinzel and his wife in their individual capacities to be "pledgors" of the collateral.

The LMA agreement required Kinzel to pledge collateral by depositing it into a "Securities Account," and the agreement granted Merrill Lynch "a continuing, first priority lien and security interest" in that account as well as "ultimate control over all instructions made with respect to" that account.  The agreement further required Kinzel to maintain financial assets in

the Securities Account of a value at least equal to a "maintenance requirement" set by Merrill Lynch "in its sole discretion." Because of the volatility of stock prices and the potential illiquidity of the pledged collateral, the maintenance requirement was substantially greater than the outstanding balance on the loan: from April to December 2008, for example, Merrill Lynch varied the maintenance requirement so that the outstanding loan balance always fell between fifty-five and fifty-eight percent of the requirement, meaning that Kinzel had to pledge collateral worth nearly double his loan balance—but Kinzel did so, all the while paying off nearly $2,000,000 of the loan balance by the end of 2008. At any time, Kinzel could deposit cash into the LMA to pay down the loan balance or to act as collateral, and Kinzel could pledge additional collateral, although Merrill Lynch imposed a cap of 540,000 on the number of shares of FUN that would count towards the maintenance requirement because of the difficulty of selling such a large volume of shares at market value if liquidation were to become necessary. (Internal Merrill Lynch correspondence indicates that in early 2009, there were approximately 55,000,000 shares of FUN outstanding, with a weekly trading volume of approximately 172,000 shares.)

As mentioned above, the LMA agreement is effectively a demand instrument: even if Kinzel did nothing at all to breach or default, the agreement's demand clause (Clause 5) gave Merrill Lynch the right at all times to "require the immediate payment of all or any portion of the balance of the LMA . . . upon demand." Wholly separate from the demand clause, the agreement also includes a remedy-events clause (Clause 7), which sets forth twelve conditions, the occurrence of *any* of which was independently sufficient to permit Merrill Lynch, "in its sole discretion and without prior notice," to "liquidate the Securities Account and/or other collateral . . . and apply the proceeds to the LMA." These remedy events include, among others not applicable here, (1) the insufficiency, "in the sole judgment" of Merrill Lynch, of the value of the financial assets in the Securities Account; (2) Merrill Lynch's "belie[f] in good faith that the value of the collateral or the Bank's security interest therein is impaired"; and (3) Merrill Lynch's determination "that there is a material adverse change in any Loan Party's financial condition or prospects *or collateral*" (emphasis added).

Nothing in the LMA agreement states or implies that Kinzel's satisfaction of the maintenance requirement was sufficient to avoid liquidation following a remedy event. Nothing

in the demand clause or elsewhere states or implies that Merrill Lynch was *required* to make a demand for repayment prior to exercising its contractual right to liquidate Kinzel's collateral upon the occurrence of a remedy event. And nothing in the remedy-events clause prevented Merrill Lynch from deeming the value of the assets in the Securities Account "insufficient" or deeming Merrill Lynch's security interest "impaired" at any time, even if the assets' value exceeded the maintenance requirement.

*The Great Recession of 2008–09*

When the market price of FUN began to fall precipitously—dropping to $12.53 per share by the end of 2008—Merrill Lynch warned Kinzel (once in November 2008 and twice in February 2009) that, because of the falling stock value, his loan balance risked exceeding seventy percent of the value of the pledged collateral (crossing the so-called 70% "LTV" or "loan-to-value" threshold). This was one event—though by no means the only event—that Merrill Lynch had, by internal guideline, set as a trigger to prompt Merrill Lynch either to demand repayment or to liquidate collateral. Appellees' Br. 6–7. Notably, the 70% LTV threshold was not in the LMA agreement (as a remedy event or otherwise), and nothing in the LMA agreement stated or implied that Kinzel would avoid liquidation of his collateral if he maintained his loan balance below a given LTV threshold. Kinzel responded to these warnings (referred to as "collateral calls," which were neither formal demands for payment nor notices of intent to liquidate collateral, but only notices that the loan was approaching 70% LTV) by liquidating non-FUN assets and paying down the loan balance.

By the end of February 2009, however, the price of FUN was falling so fast that even though Kinzel had paid the loan balance down to below $4,000,000, the decrease in collateral value prevented the LTV ratio from dropping significantly, and Merrill Lynch responded to the falling price of FUN—$7.91 per share on February 25, 2009—by increasing the maintenance requirement (to $13,899,705.50 when the loan balance was $4,006,730.69, for a 28.8% LTV ratio) and by setting a $7 trigger price for FUN, such that if the price of FUN fell below $7 per share, Merrill Lynch would begin liquidating shares to pay down the loan balance.

*Liquidation of Kinzel's Shares*

Although Merrill Lynch never formally demanded repayment from Kinzel, Kinzel's son Brett—who both worked for Merrill Lynch and was Kinzel's financial advisor, though not part of Merrill Lynch's account-management team—was in daily email contact with the Merrill Lynch account managers who would eventually call for liquidation of Kinzel's shares. (In one email, for example, Merrill Lynch VP Doug Rosen wrote to Brett regarding the Kinzel LMA, "As I'm sure you know, FUN is close to $7/share. Should it go below $7, our credit committee will look for immediate repayment of the entire loan. I'll keep a close eye on the stock.") And on March 2, 2009, with the Dow Jones Industrial Average at 6763.29—its lowest level since 1997—FUN closed at $6.99 per share, prompting Merrill Lynch to authorize liquidation of Kinzel's collateral, beginning the next day. (On the morning of March 3, Rosen, emailing a Merrill Lynch global risk manager, wrote, "Mike B. and I, along with others, discussed this at length last night and this morning. The decision to begin liquidating was made, and Hoy is working on it now.")

By 11:00 a.m. on March 3, 2009—even as Brett moved money into the LMA and as Kinzel arranged for a home-equity line of credit and for other payments to be made in the coming days and weeks in an effort to forestall liquidation of FUN shares—Merrill Lynch had sold 19,180 shares at an average price of $6.89, and by the end of the day, Merrill Lynch had sold a total of 167,900 shares at an average price of $6.3806, generating proceeds of approximately $1,071,302, which were used to pay down the loan balance.

On March 4, 2009, the global risk manager (who made the ultimate call to liquidate) advised Rosen to "continue liquidations to reduce [the] loan to $0." Rosen, however—noting that Kinzel "was bringing in as much liquidity as possible," and that the combination of the liquidated FUN shares and Kinzel's other incoming transfers had reduced the loan balance to less than $1,200,000—sought and received the risk manager's assent to "a temporary $5.50 trigger" on March 5, and Kinzel ultimately paid the loan balance in full by March 26, avoiding any further liquidation of his FUN stock. As of January 25, 2017, when we heard oral argument in this case, the market value of FUN was $64.50 per share. Kinzel asserts that he would still own the 167,900 liquidated shares if they had not been sold in 2009. Appellants' Br. 17.

*Proceedings Below*

On September 27, 2010, when FUN was trading at $12.63 per share, Kinzel and his wife sued Merrill Lynch[1] in the United States District Court for the Northern District of Ohio, initially asserting claims of breach of the covenant of good faith and fair dealing, fraud, outrageous conduct, conversion, and unjust enrichment. The Kinzels filed an amended complaint to add a breach-of-contract claim in December 2010. On March 14, 2011, the Kinzels filed a second amended complaint, which would remain the operative complaint, and which asserted the same claims as the first amended complaint.

On November 1, 2011, Judge Carr dismissed all of the Kinzels' claims except their good-faith claim. On September 11, 2012, Judge Carr recused himself on account of his relationship with Bank of America, and Judge Helmick was assigned to the case. The Kinzels filed a motion for leave to file a third amended complaint, spelling out a breach-of-contract claim (for Merrill Lynch's liquidation of FUN shares without first making a demand for repayment) distinct from the breach-of-good-faith claim (for Merrill Lynch's liquidation of FUN shares when Merrill Lynch knew that Kinzel wanted to avoid liquidation and had both the ability and the intent to repay the loan in full). Judge Helmick denied leave to amend, holding that "[t]o the extent the breach of contract allegations in the proposed third amended complaint differ from any contained in the second amended complaint, Plaintiffs fail to produce a claim that could survive a motion to dismiss."

Judge Helmick presided over a bench trial on the good-faith claim in December 2014, and entered judgment for Merrill Lynch on March 14, 2016. This appeal followed, raising two questions:

---

[1]Initially, Brett Kinzel was also a plaintiff (seeking payment of a commission from the liquidation of the FUN shares), and several other Merrill Lynch employees were defendants. The defendants included both Merrill Lynch and its successor, Bank of America. In the interest of simplicity, we refer to the plaintiffs simply as the Kinzels, and to the defendant as Merrill Lynch, as the district court did.

1. Whether the district court erred in holding that the Kinzels had not sufficiently stated a breach-of-contract claim and thus could not show cause to file a third amended complaint?

2. Whether the district court erred in granting judgment in favor of Merrill Lynch on the breach-of-good-faith claim?

## II

We generally review a district court's decision to deny leave to file a second or subsequent amended complaint for abuse of discretion. *United States ex rel. Bledsoe v. Cmty. Health Sys.*, 342 F.3d 634, 644 (6th Cir. 2003). When a district court bases its denial of a motion to amend "on the legal conclusion that the proposed amendment would not survive a motion to dismiss," however, we review the district court's decision de novo. *Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 522 (6th Cir. 1999). We review the district court's judgment for Merrill Lynch on the good-faith claim de novo, with deference to the court's factual findings. *See Blue Cross & Blue Shield Mut. v. Blue Cross & Blue Shield Ass'n*, 110 F.3d 318, 333 (6th Cir. 1997). Under the choice-of-law provision in the LMA agreement, Utah law governs both the Kinzels' good-faith claim and the breach-of-contract claim that they would have pleaded in their third amended complaint.

## III

*Issue One: Breach of Contract*

Under the law of Utah, as elsewhere, a fundamental element of any breach-of-contract claim is that the defendant must actually have breached the contract. *Bair v. Axiom Design, L.L.C.*, 20 P.3d 388, 392 (Utah 2001) (citing *Nuttall v. Berntson*, 30 P.2d 738, 741 (Utah 1934)).

In the context of secured transactions, Utah Code § 70A-9a-611 (incorporating UCC § 9-611) requires "a secured party that disposes of collateral" after default to send a "reasonable authenticated notice of disposition" to the debtor and other parties. The Kinzels argue that § 70A-9a-611 operates to invalidate the provision in the remedy-events clause (Clause 7) that allows Merrill Lynch to liquidate collateral upon the occurrence of a remedy event without first making a demand for repayment. If it does so, then only Clause 5 would have allowed Merrill Lynch to liquidate the shares of FUN, and—because Clause 5 requires Merrill Lynch to make a

demand for payment before liquidating—Merrill Lynch arguably breached the LMA agreement by liquidating without making first making such a demand.

Section 70A-9a-611 does not help the Kinzels, however, for two reasons: first, it applies only after "default." Utah Code §§ 70A-9a-611(2), -610. Here there was no default: no one has argued that the Kinzels had in any way breached their loan obligations or defaulted on a loan payment. Rather, in liquidating the shares of FUN on March 3, 2009, Merrill Lynch was exercising control over the collateral as the contract directed that Merrill Lynch could do even when there was no breach or default by the borrower. Second, § 70A-9a-611 does not apply "if the collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market." Utah Code § 70A-9a-611(4). It is undisputed that FUN shares are "of a type customarily sold on" the New York Stock Exchange.

Finally, apart from the Kinzels' argument that Merrill Lynch did not act in good faith, which we analyze separately in the following section, the Kinzels do not dispute that a remedy event occurred, nor do they argue that any other provision in the LMA agreement would have operated to prevent Merrill Lynch from liquidating when the price of FUN fell below $7 per share—or, indeed, at *any* time. Accordingly, even if all the facts in the Kinzels' pleadings are true, the Kinzels cannot show that Merrill Lynch *actually breached* any term of the LMA agreement when it liquidated the Kinzels' shares: the Kinzels had given "ultimate control" and "sole discretion" to Merrill Lynch to liquidate the collateral in the Securities Account when the stock market crashed, and Merrill Lynch acted accordingly.

That the Kinzels fulfilled their obligations under the LMA agreement does not, under any rule of contract law that we can find, somehow suspend Merrill Lynch's power to exercise its own express contractual rights. While it is bedrock contract law that one contracting party's material *failure* to perform its contractual obligations may discharge another's duty to perform, the Kinzels' *compliance* with the contract cannot vitiate Merrill Lynch's independent rights and duties under the contract, even when Merrill Lynch's exercise of such rights is at odds with what the Kinzels would prefer Merrill Lynch to do instead. *Cf. Kingston v. Preston* (1773) 99 Eng. Rep. 437, 438; 2 Doug. 689, 691 (K.B.) (noting that the interaction of contractual covenants is "to be collected from the evident sense and meaning of the parties"). Here, the evident sense and

meaning of the parties' agreement is that Merrill Lynch was to enjoy unfettered discretion in its decision to liquidate the Kinzels' collateral; that the Kinzels would have preferred Merrill Lynch to wait a while longer before liquidating cannot overcome the clear language in the contract that the Kinzels and Merrill Lynch—all sophisticated parties—chose to execute.  The district court was therefore correct to hold that allowing leave to amend would be futile because any breach-of-contract claim the Kinzels brought, to the extent that it differed from their breach-of-good-faith claim, would fail to survive a motion to dismiss.

### *Issue Two: Breach of the Covenant of Good Faith and Fair Dealing*

Under the law of Utah, the implied covenant of good faith and fair dealing imposes "as a term of every contract a duty to perform in the good faith manner that the parties surely would have agreed to if they had foreseen and addressed the circumstance giving rise to their dispute." *Young Living Essential Oils v. Marin*, 266 P.3d 814, 816 (Utah 2011).  A contract that sets forth general rights and duties may, if insufficiently specific to direct the parties' performance, be found to be "'instinct with an obligation' imperfectly expressed" that requires the parties to take reasonable steps to carry out implied contractual obligations.  *Haws v. Jensen*, 202 P.2d 229, 232 (Utah 1949) (quoting *Wood v. Lucy, Lady Duff-Gordon*, 118 N.E. 214, 214 (N.Y. 1917) (holding that where a fashion designer granted her agent the exclusive right, for at least a year, to use the designer's "indorsements" on third parties' garments in exchange for one-half of the profits from the agent's efforts, "a promise [was] fairly to be implied" by the agent to "use reasonable efforts" to bring at least some profits into existence)).

Although implied promises may be found in some contracts as in *Wood*, and although the implied covenant of good faith and fair dealing may in those cases require the parties to carry out their implied promises in good faith, the implied covenant of good faith and fair dealing does not *itself* "establish new, independent rights or duties not agreed upon by the parties."  *Malibu Inv. Co. v. Sparks*, 996 P.2d 1043, 1048 (Utah 2000) (internal quotation marks omitted).  In other words, the covenant of good faith and fair dealing may require parties to exercise their *existing* contractual rights and duties fairly and in good faith, but it does not impose any *new* contractual duties upon the parties apart from the obligation to perform existing duties fairly and in good faith.

Moreover, where a contract grants one party sole discretion in making a decision "but does not provide any express standard for exercising that discretion, the covenant imposes an objective standard of reasonableness." *Markham v. Bradley*, 173 P.3d 865, 872 (Utah Ct. App. 2007) (citing *Olympus Hills Shopping Ctr., Ltd. v. Smith's Food & Drug Ctrs., Inc.*, 889 P.2d 445 (Utah Ct. App. 1994); *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 311 (Utah 1982)). Although a party exercising contractually apportioned discretion may not exercise that discretion "for a reason outside the contemplated range—a reason beyond the risks assumed by the party claiming the breach," *Markham*, 173 P.3d at 875, a party does not breach the implied covenant simply because it "may not have followed the golden rule." *Oakwood Vill. L.L.C. v. Albertsons, Inc.*, 104 P.3d 1226, 1240 (Utah 2004).

The Kinzels advance several arguments in support of their conclusion that Merrill Lynch did not act in good faith when it liquidated the shares of FUN. First, the Kinzels argue that at the time of liquidation on March 3, 2009, the loan's LTV ratio was under 70% and thus Merrill Lynch should not have liquidated. Even if the LTV ratio was under 70%, however, the collateral remaining in the Securities Account on March 3, 2009, consisted *entirely* of FUN stock, the price of which was falling precipitously along with national markets. And more importantly, nothing about the 70% LTV threshold was actually a part of the contract—and no language in the contract supports the Kinzels' apparent contention that Merrill Lynch had an implied obligation to refrain from liquidating their collateral when the loan was below 70% LTV. Thus, to hold Merrill Lynch as acting in bad faith because it liquidated when the loan was below 70% LTV would be to impose a "new, independent" duty not contemplated by the contract language, and Utah law does not do that.

Second, the Kinzels argue that Merrill Lynch acted in bad faith by liquidating when the price of FUN had closed only one cent lower than the $7.00 trigger price on March 2, 2009, and when FUN opened at a few cents above $7.00 on March 3, 2009, before falling again below $7.00. But as with the 70% LTV threshold, nothing about a $7.00 trigger—let alone a duty not to liquidate when the stock price falls *only a little* under the trigger—appears anywhere in the contract, so Merrill Lynch cannot be said to have acted in bad faith for breaching such a duty.

Third, the Kinzels argue that Richard Kinzel was "doing everything right" and taking great strides to pay down the loan balance when Merrill Lynch liquidated. True, the evidence of record reveals that Merrill Lynch was well aware of Kinzel's attempts to secure a home-equity line of credit and move other assets into the Securities Account in order to increase collateral or pay off the loan. At the same time, the evidence of record indicates that Merrill Lynch sought to avoid liquidating and did so only when (1) the *only* collateral remaining in the Securities Account was FUN stock, and (2) the Dow Jones Industrial Average was at a twelve-year low, with FUN at its lowest price since 1991. And despite the falling stock prices, Merrill Lynch agreed to halt its liquidation after only one day, and to impose a new $5.50 trigger value before further liquidation would occur in the future. Accordingly, the district court properly held that Merrill Lynch exercised its discretion within the "contemplated range" of "judgment based upon sincerity, honesty, fair dealing and good faith." *Kinzel v. Bank of America*, Case No. 3:10cv2169, 2016 WL 951531, at \*6 (N.D. Ohio Mar. 14, 2016) (first quoting *Markham*, 173 P.3d at 875; then quoting *Resource Mgmt. Co. v. Weston Ranch & Livestock Co.*, 706 P.2d 1028, 1037–38 (Utah 1985)).

IV

In sum, the district court properly held that allowing leave to file a third amended complaint would be futile, because the Kinzels could not state a claim for breach of contract, and the district court properly granted judgment on the breach-of-good-faith claim in favor of Merrill Lynch. Accordingly, we **AFFIRM**.